

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0438-12

**ANTHONY WAYNE HACKER, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FOURTEENTH COURT OF APPEALS
### HARRIS COUNTY

KELLER, P.J., delivered the opinion of the Court in which PRICE, WOMACK, JOHNSON, KEASLER, HERVEY, COCHRAN and ALCALÁ, JJ., joined. MEYERS, J., did not participate.

We must determine whether the evidence shows that appellant violated a "no contact" condition of probation, when the condition allowed contact by telephone regarding issues of child custody and when appellant and his wife had an arrangement for appellant to babysit their children at his wife's home while she was at work. We conclude that the evidence fails to show that appellant violated the "no contact" condition.

### I. BACKGROUND

On December 2, 2010, appellant was placed on deferred-adjudication probation for assaulting his wife. Condition 22, the "no contact" condition of his probation, provided:

> You are not to contact the complainant, JENNIFER HACKER, in person, in writing, by telephone, via the internet, a third party or any other means for any reason except as specifically permitted by the Court. YOU MAY SPEAK TO HER VIA TELEPHONE ONLY FOR THE PURPOSE OF CHILD CUSTODY ISSUES.

The State filed a motion to revoke on the basis that appellant violated this condition.

The evidence at trial showed that appellant's orientation paperwork, filled out on December 15th, initially listed his home address as his wife's address, but that address was crossed out and his brother's address was written in its place. Appellant testified that he had initially listed his wife's residence as his own out of "force of habit" and not because he actually lived there.

Appellant's probation officer testified to a conversation that she had with appellant on January 3, 2011. She asked appellant about the crossed-out address,[1] and he responded that his brother had a spare bedroom and that appellant had a change of clothes and a toothbrush there. The probation officer told appellant that she was concerned because he was not supposed to have any contact with his wife other than by telephone. Appellant replied that he had not physically seen his wife but that he talked to her on a daily basis about his children, whom he would pick up from school. He said that he would call his wife to arrange a time to pick up the children and take them to her home. He would then stay with them at the residence until she would call him and tell him that she was on her way home. He would then leave before his wife arrived. Appellant said he spent

---

[1] When asked on cross-examination if appellant could have written his wife's address out of habit and crossed it out when he realized he was not living there, the probation officer replied, "That could have happened."

the night on occasion when his wife worked the night shift. Appellant told the probation officer that he had had this arrangement with his wife since he was placed on probation on December 2nd.

Appellant's children were aged seventeen and fourteen. The probation officer testified that appellant described the fourteen-year-old as mildly retarded. Appellant's wife testified that the fourteen-year-old was a special-needs child with the mental age of an eight- or nine-year-old. Appellant's wife also testified that she worked in the emergency room at a hospital.

The trial judge took judicial notice that a protective order had barred appellant from being at his wife's residence and that the protective order ended on December 19th. Appellant and his wife both testified that appellant first visited his wife's home on December 23rd. Appellant also testified that his understanding of the "no contact" requirement was that he could not be living at his wife's residence.

The probation officer further testified that appellant had told her that he would not have pled guilty if he had known what was in the offense report and that his wife had lied about what had happened. Appellant's wife testified that she did not want the "no contact" condition and that it was difficult on her.

The trial judge adjudicated appellant's guilt, stating on the record that she was making a credibility finding in favor of the probation officer. In support of her conclusion that appellant violated the conditions of probation, the trial judge stated that appellant had "violated the terms by continual phone conversations on everything." The trial judge also stated her conclusion that appellant was living at his wife's residence because, "You don't live where you have one change of clothes." The trial judge sentenced appellant to four years in prison.

The court of appeals affirmed, holding that the evidence was sufficient to show that "appellant engaged in prohibited contact with his wife."[2] The court reasoned that the evidence was sufficient to show that appellant was living at his wife's residence because he kept most of his belongings there and initially listed it as his own.[3] The court further reasoned that the evidence supported a finding that appellant and his wife were attempting to conceal evidence when they testified at trial that appellant did not visit his wife's residence until December 23rd.[4] "Having found that appellant was living at his wife's residence," the court of appeals concluded, "the trial court could have reasonably concluded appellant was in prohibited physical contact with his wife. In other words, because appellant was living in the same residence as his wife, it is reasonable to infer they came into contact with each other."[5]

## II. ANALYSIS

### A. Standard

To convict a defendant of a crime, the State must prove guilt beyond a reasonable doubt,[6] but to revoke probation (whether it be regular probation or deferred adjudication), the State need prove

---

[2] *Hacker v. State*, No. 14-11-00146-CR, slip op. at 4 (Tex. App.–Houston [14th Dist.] February 16, 2012) (not designated for publication).

[3] *Id.*

[4] *Id.*

[5] *Id.* at 5.

[6] Tex. Penal Code § 2.01.

the violation of a condition of probation only by a preponderance of the evidence.[7] In the probation-revocation context, "a preponderance of the evidence" means "that greater weight of the credible evidence which would create a reasonable belief that the defendant has violated a condition of his probation."[8] Although a much lower standard than "beyond a reasonable doubt," the preponderance of the evidence standard is a much higher standard than the search-and-seizure standards of "probable cause" and "reasonable suspicion."[9]

The State's burden of proof informs the appellate standard of review for legal sufficiency of the evidence.[10] When the burden of proof is "beyond a reasonable doubt," an appellate court reviews the evidence in the light most favorable to the prosecution and asks whether a rational jury could have made the requisite finding beyond a reasonable doubt.[11] For issues governed by the less rigorous burden of proof of "preponderance of the evidence," the appellate standard of review for legal sufficiency is also less rigorous. For probation-revocation cases, we have described the

---

[7] *Leonard v. State*, 2012 Tex. Crim. App. LEXIS 1598, at 14 (November 21, 2012); *Ex parte Doan*, 369 S.W.3d 205, 210 (Tex. Crim. App. 2012).

[8] *Rickels v. State*, 202 S.W.3d 759, 764 (Tex. Crim. App. 2006).

[9] *York v. State*, 342 S.W.3d 528, 543 n.86 (Tex. Crim. App. 2011).

[10] *Brooks v. State*, 323 S.W.3d 893, 910 n.41 (Tex. Crim. App. 2010) (noting that that "civil appellate standards of 'legal' and 'factual' sufficiency are moving in the direction of essentially a *Jackson v. Virginia* standard as the burden of proof at trial increases"); *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005) ("As we recently stated, the standard for legal sufficiency works in tandem with the standard of review—'whenever the standard of proof at trial is elevated, the standard of appellate review must likewise be elevated.'").

[11] *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

appellate standard of review as whether the trial court abused its discretion.[12]  In addition, we have explained that the trial judge is the sole judge of the credibility of the witnesses and the weight to be given to their testimony.[13]  In civil cases that are governed by the preponderance-of-the-evidence burden of proof, the legal-sufficiency standard has been described as a review for whether there is "more than a scintilla" of evidence.[14]  Evidence does not meet this standard when "the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence"[15] or when the finder of fact must "guess whether a vital fact exists."[16]  Furthermore, the Texas Supreme Court has explained, "some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence."[17]

One practical way in which a legal-sufficiency review varies depending upon the burden of proof in the underlying case is the treatment of extrajudicial confessions.  When the burden of proof is "beyond a reasonable doubt," a defendant's extrajudicial confession does not constitute legally sufficient evidence of guilt absent independent evidence of the *corpus delicti*.[18]  The c*orpus delicti* doctrine requires that evidence independent of a defendant's extrajudicial confession show that the

---

[12]  *Rickels*, 202 S.W.3d at 763.

[13]  *Davila v. State*, 547 S.W.2d 606, 609 (Tex. Crim. App. 1977).

[14]  *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010).

[15]  *Id.*

[16]  *City of Keller*, 168 S.W.3d at 813.

[17]  *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 728 (Tex. 2003).

[18]  *Bible v. State*, 162 S.W.3d 234, 246 (Tex. Crim. App. 2005).

"essential nature" of the charged crime was committed by someone.[19] By contrast, in the probation-revocation context, controlled by the lesser, "preponderance of the evidence" burden of proof, an uncorroborated extrajudicial confession may be sufficient to support revocation.[20]

But what happens when a defendant makes an extrajudicial statement that does not admit to conduct that violates probation but from which one might possibly infer that such conduct took place? In a concurring opinion, former Presiding Judge Onion suggested that, when the defendant's extrajudicial statement does not admit to all of the allegations necessary to sustain the State's motion to revoke, some sort of corroboration is required.[21] How to review the evidence when the probationer does not confess to conduct that is a violation of probation is one of the questions implicated in the present case.

## B. Did Appellant Confess to Prohibited Contact?

But first, we address the State's contention that appellant did confess to conduct that was a violation of probation.

### 1. *Telephone Conversations*

At oral argument, the State claimed that appellant admitted to telephone communications that were in violation of the conditions of probation. Acknowledging that the conditions contained an exception for telephone communications about child custody, the State argued that the wife telling

---

[19] *Id.*

[20] *Bush v. State*, 506 S.W.2d 603, 605 (Tex. Crim. App. 1974); *Smith v. State*, 160 Tex. Crim. 438, 439-40, 272 S.W.2d 104, 105-06 (1954) (confession, uncorroborated as to the *corpus delicti*, constitutes sufficient grounds for revocation).

[21] *Coleman v. State*, 505 S.W.2d 878, 881-82 (Tex. Crim. App. 1974) (Onion, P.J., concurring).

appellant, "I'm coming home; it is time for you to leave," was not a statement made for the purpose of child custody. So, the State contends, appellant's communications with his wife for the purpose of avoiding physical contact with her while he obtained and relinquished custody over the children were prohibited communications.

We disagree. These conversations related to the timing of the defendant's custody over the children—when custody would begin and when it would end. Moreover, the State's position would place appellant in a catch-22: He needed to know when to obtain and relinquish custody of his children so that he could avoid physical contact with his wife, but because he was prohibited from contacting his wife through a third party, he could obtain the needed information only if his wife conveyed it to him over the telephone.

The State also argued that appellant's telephone conversations violated the conditions of probation because he "consistently talked to her on the phone on a consistent basis." But the conditions of probation said nothing about the frequency of telephone conversations; the restriction was only on their content. Appellant's admission that he talked to his wife on the telephone frequently for the purpose of child custody was not an admission that he engaged in conduct that violated his probation.[22]

### 2. *Proximity*

The State contends that appellant's care of his children in his wife's home was an admission of "proximity" contact to his wife. The State argues that appellant essentially lived in the wife's

---

[22] The State's argument may also be construed as saying that a finder of fact could infer from the frequency of the calls that appellant and his wife had discussions unrelated to child custody. We address that question later in this opinion.

home and that his arrangement with his wife made him a "looming presence" in her home. In support of its contention, the State cites several out-of-state cases.[23] All of those cases except *MacDonald* involved probationers who were physically near a protected person.[24] The *MacDonald* case was not a proximity case at all; it merely referred to the concept of proximity in a manner consistent with the other cases relied upon by the State.[25]

---

[23] *People v. Devorss*, 277 P.3d 829, 836 (Colo. App. 2011); *Commonwealth v. Kendrick*, 841 N.E.2d 1235, 1239 (Mass. 2006); *Commonwealth v. Wilcox*, 823 N.E.2d 808, 810 (Mass. App. Ct. 2005), *aff'd* 841 N.E.2d 1240 (Mass. 2006); *State v. Danaber*, 819 A.2d 691, 694-95 (Vt. 2002); *Commonwealth v. MacDonald*, 736 N.E.2d 444, 447 n.7 (Mass. App. Ct. 2000), *aff'd*, 757 N.E.2d 725 (Mass. 2001); *State v. Leggett*, 709 A.2d 491, 493 (Vt. 1997).

[24] *Devorss*, 277 P.3d 836-37 ("No contact" condition prohibited the probationer from "sitting in close proximity to a child under the age of eighteen years, even where he does not make eye contact with the child, communicate with the child, or physically touch the child" and "must be read to prohibit his decision to sit adjacent to a child in a restaurant booth."); *Kendrick*, 841 N.E.2d at 1239 (The "no contact" condition requires the probationer "to avoid encountering or engaging children in any way; to refrain from attendance at places where proximity to, and thus an encounter with, children is likely; and promptly to remove himself from such proximity if an encounter arises unexpectedly. The condition is not, as the defendant suggests, simply a requirement not to touch or speak to a child." The defendant attended an antique car show where children were present, sat near a food concession stand, displayed his antique car, and brought his dog with him and allowed it to wander through the crowd.); *Wilcox*, 823 N.E.2d at 810 (Probationer violated "no contact" condition when he drove his car close to a fourteen-year-old girl as she walked home from school and, thereafter, stared at that girl and two other young girls from within a small grocery store and, then, followed them back to the home of one and repeatedly drove around the block.); *Danaber*, 819 A.2d at 694 (Probationer was in close physical proximity to the child victim, whom he was not supposed to contact, at a residence and then later at a bus stop.); *Leggett*, 709 A.2d at 493 (Despite the fact that "no contact" order prohibited probationer from having contact with children under age sixteen, probationer did not leave the home of a seven-year-old child, when another child, under age sixteen, visited. Also, probationer attended a Super Bowl party where the seven-year-old was present.).

[25] The probationer had sent the protected person a letter, and the appellate court found that the trial court had imposed a "stay away" order rather than a "no contact" order. *MacDonald*, 736 N.E.2d at 446-48. In a footnote, the court discussed the difference between these two types of orders: a "stay away" order is satisfied so long as there is no physical proximity between the probationer and the protected person, but a "no contact" order requires, in addition, that the

The proximity cases cited by the State refer to a probationer's proximity to a person, not to the person's property. They are inapposite because appellant never admitted to being physically near his wife. At oral argument, Judge Cochran asked whether appellant could have cared for the children at his wife's home without violating the "no contact" condition if his wife had gone to New Jersey to help with the aftermath of Hurricane Sandy. The State conceded that staying at his wife's home would not be a violation of the "no contact" condition under those circumstances. We agree with this concession, and we further think that presence in his wife's home, even on a frequent basis, does not by itself establish prohibited contact with his wife. To be sure, the term "contact" has a broad meaning. Appellant was prohibited from contacting his wife in person, by mail, by email, or by any other means. But simply occupying his wife's home when she was not there is not a prohibited communication with his wife nor is it proximity to her.

The trial judge concluded that appellant was living at his wife's residence because all of his property, other than a toothbrush and a change of clothes, was there. If what the trial judge meant by this conclusion were simply that the arrangement described by appellant—keeping almost all of his possessions at his wife's home and staying at the home on a frequent basis, though never at the same time as his wife—should aptly be labeled as "living there," then it begs the question. However one wants to label the arrangement described by appellant, that arrangement does not constitute prohibited contact with his wife.[26]

---

probationer not communicate with the protected person by speech, writing, or any other means. *Id.* at 447 n.7.

[26] Whether physical proximity can be inferred from what appellant did say is a subject that we discuss later in this opinion.

## C. Can Prohibited Contact Be Inferred from the Evidence?

Even though appellant did not admit to engaging in conduct that violated the "no contact" condition, we must address whether such conduct can be inferred by the finder of fact from the evidence. We turn to the evidence relied upon by the State and by the courts below.

### 1. *Crossed-Out Address*

Even though appellant testified that he initially filled out the form with his wife's address out of force of habit, the trial judge did not have to believe him. Nevertheless, while it is certainly possible that appellant initially filled in his wife's address because it really was his current address, such a conclusion would be mere speculation. At most, the crossed-out address would create suspicion regarding appellant's current residence, but, given that the crossed-out address occurred at the beginning of his probation when the requirement that he live elsewhere had only recently been imposed, it would not even be strong suspicion.

### 2. *Appellant's Description of the Child Custody Arrangements*

Given the deferential nature of a sufficiency review, we accept the trial court's decision to believe the probation officer's description of appellant's statements to her rather than the testimony of appellant and his wife. Thus, we accept that appellant told the probation officer that his arrangement with his wife to care for the children at her residence began when he was placed on probation, on December 2nd, and that his statement is proof of that fact. We disregard contrary testimony from appellant and his wife.

The question, though, is whether it was rational to infer from appellant's statements describing the custody arrangements that appellant engaged in *other* conduct that constituted

prohibited contact with his wife. For example, appellant admitted that he talked to his wife on the telephone frequently for the purpose of arranging child custody. Would it be rational to infer from this admission that appellant must have talked to his wife about other topics? Also, appellant said that he frequently stayed at his wife's home to care for the children when she was not there and that almost all of his possessions were there. Would it be rational to infer from these statements that appellant must also have been at his wife's home when his wife was there?

In its brief, the State contends that a finder of fact could draw inferences from the fact that appellant "admittedly talked to his wife on the telephone on a regular basis." In concluding that appellant engaged in "continual phone conversations on everything," the trial judge seems to have drawn the inference that the telephone conversations, being frequent, must have involved matters other than child custody. But neither the State, nor the trial court, nor the court of appeals has explained how one can infer the content of telephone conversations from their frequency, and no explanation is apparent to us.

Relying upon *Rickels v. State*,[27] the State contends that appellant's statements can at least be used to infer that appellant was present in his wife's home while his wife was there. In *Rickels*, one of the conditions of probation provided that the defendant could not be within 300 feet of premises where children gather.[28] The evidence showed that the defendant lived in a house with a front door that was 296 feet from an elementary school.[29] The bottom portions of the front windows were

---

[27] 202 S.W.3d 759 (Tex. Crim. App. 2006).

[28] *Id.* at 762.

[29] *Id.* at 764.

covered by cardboard and a padlock was on the front door.[30]  A probation officer testified that the cardboard on the windows prevented him from seeing inside the probationer's home.[31]  Rickels's attorney argued that, because terrain and shrubbery interfered with the view of the school, there was no evidence that Rickels even knew the school was there.[32]  We held that the trial court could rationally infer that the defendant was on a portion of his property that was within 300 feet of the school from the fact that the defendant's front yard and front door were within that distance.[33]  We also held that the trial court could have reasonably inferred that, at some time during his probationary term, the defendant was within four feet of his front door.[34]

We do not think that the inferences the State seeks to have us draw in the present case are of the same quality as the inferences drawn in *Rickels*.[35]  The condition that Rickels was found to

---

[30]  *Id.* at 760 n.2.

[31]  *Id.*

[32]  *Id*. at 761.

[33]  *Id.*

[34]  *Id.*

[35]  Caselaw includes examples of living arrangements and relationships that are not the norm but that, nevertheless, are insufficient to support an inference that something else must be going on.  *See Brown v. Apfel*, 60 Soc. Sec. Rep. Service 217, 1999 U.S. Dist. LEXIS 2976, at 8-9 (S.D.N.Y. 1999) (Administrative law judge's determination that the plaintiff was married for the purpose of SSI benefits was not supported by substantial evidence even though he cohabited with the mother of his child when the undisputed testimony of both the plaintiff and the woman was that they had never considered themselves to be married.); *In re Wilbur*, 206 B.R. 1002, 1007 (Bankr. M.D. Fla. 1997) (Despite bankruptcy trustee's contention that debtor "keeps most of his personal property in storage," court concluded that "homestead status cannot be denied because Debtor keeps some of his personal property in a storage facility."); *Brodus v. State*, 449 So. 2d 941, 942 (Fla. Dist. Ct. App. 1984) (Condition of probation that prohibited the defendant from living with a member of the opposite sex who was not a family member was overly broad

have violated prohibited him from going within 300 feet of certain kinds of premises, with no exceptions. The condition that appellant was found to have violated prohibited him from contacting a certain person, but it allowed a particular exception. The State would have us infer a violation of the condition from an acknowledgment that appellant acted under the exception. If the condition in *Rickels* had, for example, made an exception for Sundays, we would not have inferred from his presence near a school on a Sunday that he had been near the school on other days.

Appellant's statements that he took care of the children at his wife's home while she was gone might be probative in combination with other evidence, depending on the nature of that other evidence. If, for example, the State had introduced evidence of bruises on the wife's face, then appellant's admission that he had been to his wife's house might be probative to show appellant as the source of those bruises, and if he was the source of the bruises, then he engaged in prohibited contact. But the State introduced no evidence that could demonstrate the prohibited contact itself.

### 3. *Motive and Opportunity*

As evidence supporting the trial court's decision to revoke probation, the State points to appellant's statement that he would not have pled guilty if he had known what was in the offense report, and it points to his wife's testimony that she did not want the "no contact" condition and that

---

because it did not take into account the "innocent roommate" situation in which two or more share a house and split the rent.); *Clements v. Clements*, 21 Pa. D. & C. 661, 662 (1934) (disagreeing with master's conclusion that the facts did not show justification for wife's desertion because evidence showed that husband boycotted his wife "in all the elementary relations and amenities of marital life" and where husband himself admitted, "While we were both living in the same house, we lived in different rooms and had no contact with each other at all."). While the facts in *Clements* would be sufficient to show "contact" for purposes of a "no contact" condition of probation, this case, plus the others cited, illustrate the variability with which living arrangements can occur.

it was difficult on her. This evidence has some tendency to show motive for appellant to have prohibited contact, and the wife's testimony may also show opportunity to do so. We have said that "[m]otive is a significant circumstance indicating guilt."[36] One court of appeals has aptly observed that "proof of motive might be the glue that holds the entire case together."[37]

But these statements are based upon the unstated assumption that there is evidence of something to be "glued." We have held that motive and opportunity alone are not sufficient to demonstrate that a fire was an arson committed by the defendant.[38] We have also held that motive alone is not sufficient to corroborate the testimony of an accomplice.[39] And we have held that evidence that a person other than the defendant had a motive to commit murder is not admissible absent proof of opportunity to do so and some evidence tending to connect the other person to the crime.[40] The holdings with respect to accomplice-witness testimony and the admission of evidence

---

[36] *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

[37] *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting from the court of appeals's opinion).

[38] *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012) ("motive and opportunity are not elements of arson and are not sufficient to prove identity"); *Massey v. State*, 154 Tex. Crim. 263, 268-69, 226 S.W.2d 856, 859 (1950) ("But motive and opportunity, alone, are not sufficient to establish that he set fire to the building. There must be some testimony showing that the fire was of incendiary origin—that is, that someone willfully burned the building."). *See also Umstead v. State*, 435 S.W.2d 156, 158 (Tex. Crim. App. 1968) (citing *Massey*).

[39] *Leal v. State*, 782 S.W.2d 844, 852 (Tex. Crim. App. 1989); *Umstead*, 435 S.W.2d at 158.

[40] *Spence v. State*, 795 S.W.2d 743, 754-55 (Tex. Crim. App. 1990); *Porch v. State*, 50 Tex. Crim. 335, 342, 99 S.W. 102, 106 (1906); *Thompson v. State*, 35 Tex. Crim. 511, 34 S.W. 629, 523 (1896).

support the notion that the issue is not simply one of sufficiency under a reasonable doubt standard but whether motive, by itself, even qualifies as some evidence.

Evidence of motive helps link a defendant to wrongful conduct or is supportive of other evidence of such conduct. The same is true of evidence of opportunity. But without evidence that wrongful conduct has occurred, there is nothing for motive and opportunity evidence to link the defendant to. If, for example, John has a motive for murdering Mary, but there is no evidence that Mary is dead (much less evidence that her death was a homicide), then John's motive is meaningless. His motive alone does not establish that a murder occurred, and the motive cannot link John to a murder without evidence that there was a murder. Motive alone is not even some evidence of a murder that could be used to revoke John's probation.

As we explained in Part 2 above, the State did not introduce any evidence that would establish that prohibited contact occurred. Without that, appellant's motive and opportunity to engage in prohibited contact is not evidence that he actually did so.

### 4. Perjury

The State and the court of appeals also suggest that appellant and his wife attempted to conceal evidence by giving false testimony about the date appellant began visiting his wife's home to care for the children and about how much property he left there. Relying upon *Wright v. West*,[41] the State contends that the trial judge was entitled to consider "whatever it concluded to be perjured testimony as affirmative evidence of guilt."[42]

---

[41] 505 U.S. 277 (1992).

[42] State's brief, quoting *Wright*, 505 U.S. at 296.

In *Wright*, the Supreme Court did indeed hold that perjured testimony could be affirmative evidence of guilt.[43] The Court cited, as examples, *Wilson v. United States*,[44] *United States v. Zafiro*,[45] and *Dyer v. MacDougall*.[46] In *Wilson*, the Supreme Court stated that the jury could regard "false statements in explanation or defence made or procured to be made as in themselves tending to show guilt. The destruction, suppression or fabrication of evidence undoubtedly gives rise to a presumption of guilt to be dealt with by the jury."[47] In *Zafiro*, the Seventh Circuit, in an opinion by Judge Posner, explained that a defendant did not have to testify, "but if he does and denies the charges and the jury thinks he's a liar, this becomes evidence of guilt to add to the other evidence."[48] And in *Dyer*, the Second Circuit, in an opinion by Judge Learned Hand, stated that a denial of wrongful conduct "may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies."[49]

---

[43] *Wright*, 505 U.S. at 296.

[44] 162 U.S. 613 (1896).

[45] 945 F.2d 881 (7th Cir. 1991), *aff'd on other grounds*, 506 U.S. 534 (1993).

[46] 201 F.2d 265 (2d Cir. 1952).

[47] 162 U.S. at 621.

[48] 945 F.2d at 888.

[49] 201 F.2d at 269.

But in *Wright*, *Wilson*, and *Zafiro* the fact that a crime had occurred was established by other evidence. In *Wright*, a home had been burglarized.[50] *Wilson* was a murder prosecution, and there was a dead body.[51] And in *Zafiro*, illegal drugs were found in the home.[52]

*Dyer* was an appeal from the granting of summary judgment to the defendant in a civil suit alleging slander.[53] The Second Circuit explained that, if the case went to trial, the plaintiff would have no witnesses to prove slander except for the two defendants, who would deny that the slanders had been uttered.[54] Upholding the summary judgment, the court said that, although "in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, we think it plain that a verdict would nevertheless have to be directed against him."[55] So, *Dyer* is a case in which false testimony was held to be insufficient, and if one examines the facts, it is also a case in which the fact that wrongful conduct had occurred was not established because the plaintiff had no evidence that a slander had been uttered. We conclude that, as with evidence of motive, evidence of perjury can be significant linking evidence when it has been established that a separate crime or wrongful conduct has occurred, but

---

[50]  505 U.S. at 295.

[51]  162 U.S. at 613-14.

[52]  945 F.2d at 888.

[53]  201 F.2d at 266.

[54]  *Id.* at 268.

[55]  *Id.* at 269.

the commission of perjury is not, by itself, sufficient to infer that a separate crime or wrongful conduct has occurred.[56]

The present case involves more than just testimony that is believed to be false; it involves testimony that conflicts with an earlier, extrajudicial statement. But we have already accepted the earlier, extrajudicial statement as true for purposes of conducting a sufficiency review and have determined that it does not establish a violation of the "no contact" order. The State seeks to use the alleged perjury about the date appellant began visiting his wife's home to care for the children and about how much property he left there to infer the existence of a collateral fact—whether appellant was present in the home at the same time as his wife.[57] But as in *Dyer*, we cannot infer this fact from the linking evidence of the alleged perjury.

### 5. *Violating the Protective Order*

Finally, the State contends that the evidence shows that appellant violated a protective order that barred him from being at his wife's residence because the evidence shows that he was at his wife's residence before December 19th. The State candidly admits that violation of the protective order is not enough to revoke appellant's probation because the motion to revoke did not allege a violation of the law, but the State argues that it is a circumstance to consider.

---

[56] We note, however, that in a prosecution for perjury, the false statement is itself the *corpus delicti*. *Martinez v. State*, 91 S.W.3d 331, 340 (Tex. Crim. App. 2002).

[57] We also point out that appellant had an obvious motive to lie about when the custody arrangement began and how much of his property was at his wife's residence for reasons that did not necessarily inculpate him as violating the "no contact" condition. The probation officer was obviously dissatisfied with the arrangement as appellant had originally explained it, and the State has taken the position that the explained arrangement was itself a violation of the conditions of probation.

But any purpose that might be served by such evidence—such as proving motive, intent, or even character conformity (setting aside any potential admissibility issues)[58]—would not be probative absent evidence that conduct occurred that would be a violation of the "no contact" condition, the violation that was alleged in the State's motion. We have already discussed motive; intent, at least as it would be used here, raises the same concerns. Appellant's state of mind is unimportant if the existence of the prohibited conduct has not been established, just as a murder defendant's state of mind is unimportant if there is no evidence that the alleged victim is dead.

And like motive, a character-conformity inference is one that links the defendant to an act that has been shown to have occurred. It does so by using a prior act to link the defendant to a subsequent act, but if there is no evidence that the subsequent act occurred, then it is impossible to determine that the defendant acted in conformity with his prior behavior. For example, John's murder of Fred as character-conformity evidence to show that he also murdered Mary makes sense only if it is shown that Mary is dead and we are trying to ascertain whether John killed her. Otherwise, one could just draw a name out of a hat and say, "You killed Fred, so you must have killed this person also because I have not seen him lately."

### 6. Combined Weight of the Evidence

Appellate courts are not permitted to use a "divide and conquer" strategy for evaluating sufficiency of the evidence.[59] Rather, a reviewing court must consider the combined and cumulative

---

[58] *See* TEX. R. EVID. 404(b).

[59] *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

force of all the evidence.[60] But the State cannot prevail under the combined and cumulative force of all of the evidence in the present case because the State failed to introduce evidence that any prohibited conduct had occurred. What the State had here was just linking-type evidence. Appellant had motive and opportunity for prohibited contact because he expressed buyer's remorse about pleading guilty and his wife did not want the "no contact" order. Appellant lied about collateral issues regarding when the child-care arrangement began and how much property of his remained at the residence. Appellant violated the protective order, which might show motive, intent, or even character. The State also had other circumstantial evidence that was perhaps suspicious but did not establish the fact of prohibited contact: the crossed-out address, appellant's admission to being present at his wife's house when she was not there, and appellant's admission to frequent telephone conversations with his wife about child-custody matters.

None of this evidence established that prohibited contact occurred. Without that, all of this evidence was mere "suspicion linked to other suspicion."[61] We hold that the evidence was legally insufficient to meet the State's allegation in its motion to revoke, and therefore, the trial court abused its discretion in revoking appellant's probation. We further hold that the court of appeals erred in upholding the trial court's judgment in doing so. We reverse the judgments of the courts below, and we order that the State's motion to revoke probation be dismissed.

Delivered: January 16, 2013
Publish

---

[60] *Garcia v. State*, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012).

[61] *See* this opinion, footnote 17.