

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00109-CR

ANIBAL ALEJANDRO HERNANDEZ            APPELLANT

V.

THE STATE OF TEXAS            STATE

----------

### FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY
### TRIAL COURT NO. 1341966D

----------

## MEMORANDUM OPINION[1]

----------

Appellant Anibal Alejandro Hernandez appeals his conviction for the offense of capital murder and sentence of imprisonment for life without parole. On appeal, Appellant contends the evidence is insufficient to support his conviction. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## BACKGROUND

In the indictment, the State alleged that on or about September 7, 2013, in Tarrant County, Texas, Appellant intentionally or knowingly caused the death of Mark Anthony Torres, by shooting him with a firearm, a deadly weapon, and that Appellant also intentionally or knowingly caused the death of Aracely Charles by shooting her with a firearm, a deadly weapon, and that both murders were committed during the same criminal transaction. *See* Tex. Penal Code Ann. § 19.03(a)(7)(A) (West Supp. 2016). A jury found Appellant guilty as charged in the indictment. As required by statute, the trial court sentenced Appellant to life imprisonment without parole. *See id.* § 12.31(a)(2) (West Supp. 2016).

## EVIDENCE

Appellant sold marijuana and cocaine for Torres out of an apartment. The apartment was referred to as a trap house. Appellant had been living in the trap house for two or three months. Torres and his wife, Charles, lived elsewhere, and normally only Torres would come to the trap house.

On the night of September 6, 2013, Appellant entertained a small group at the trap house. The group consisted of Torres, Charles, Miguel Trevino, Carlos De Jesus, Victoria Tijerina, and Appellant. Zulema Reta and Anna Esparza arrived to join the gathering around 3:00 a.m. on September 7, 2013.

Uninvited, a number of Appellant's teenage friends arrived at the party as well.[2] One of them explained that they had been at another party, but a fight had broken out and the police came, "so [they] had to find somewhere else to go party."

Torres had a policy of not letting anyone he did not know in the trap house. Torres grew incensed when the teenagers did not leave, so he grabbed a pistol, pointed it at the teenagers, and ordered them out. The teenagers left.

Although now free of the teenagers, Torres's anger towards Appellant for letting them into the trap house persisted. Torres was also angry at Trevino because Torres had learned from some of the teenagers that Trevino had given Appellant cocaine after Torres had previously told Trevino that Appellant was not to have any drugs; Torres thought cocaine made Appellant "panic and go crazy."

While Torres berated Appellant, Appellant, while on his knees, kept his head down and repeated over and over, "Yes, sir." Torres grabbed a pistol and pointed it at Appellant's head and shouted, "You know I can kill you right now. . . . Both of y'all. . . . I can kill everybody in the apartment." Turning his attention to Trevino, Torres asked Appellant what he should do with him. Appellant responded, "Kill him."

Esparza, seeing Torres pointing the gun at both Appellant and Trevino, acknowledged being "a little bit freaked out." De Jesus, who was also still

_____

[2]Appellant himself turned twenty in August 2013.

3

present, stood beside Torres, kept quiet, and simply looked on. Charles, however, intervened and managed to calm Torres down. When the group informed Torres that everyone, including Appellant, was leaving, Torres responded, "Yeah, y'all need to get . . . out of my house."

Appellant, Trevino, De Jesus, Reta, and Esparza then went across the street to Trevino and De Jesus's apartment complex. De Jesus and Esparza thereafter formed one group, and Appellant, Trevino, and Reta formed another.

Appellant and Trevino wanted to return to the trap house and "jump" Torres, and one of them made the comment that it was "[k]ill or be killed." Reta tried to discourage Appellant and Trevino from doing anything rash.

De Jesus and Esparza then rejoined Appellant, Trevino, and Reta. Appellant and Trevino argued back and forth about who was going to kill Torres. Appellant told Trevino, "No, he pointed at me, so I have to do it. He's disrespecting me." Because Torres had pointed the gun at Trevino as well, Trevino responded, "No, I'll do it because he disrespected me, too." Appellant, realizing that Esparza and Reta had overheard their plans, told Trevino that he would have to get rid of Esparza and Reta too, but Trevino nixed that idea.

Both Esparza and Reta tried to discourage Appellant and Trevino from going through with their plans. Esparza explained, "They were all drunk. You could tell they were [on] drugs, so they—they weren't thinking right [about] what they were . . . going to do." Esparza testified that she and Reta tried to tell Appellant "not to do it," and when pressed about what specifically they were

4

trying to tell Appellant not to do, she responded, "To try to kill [Torres] and [Charles]." Appellant and De Jesus bluntly instructed Esparza and Reta that it was time for them to leave, so Esparza and Reta left; it was around 6:00 a.m.

At 6:13 a.m., a 911 dispatcher received a call of shots heard in the area of the trap house. Around 8:00 a.m., a maintenance worker at the apartment complex that included the trap house saw Appellant carrying a television, a laptop, and an electronic game, looking "like he was waiting for somebody." The maintenance worker described Appellant's arms as being smeared with blood stains; after the maintenance worker chatted with Appellant for several minutes, Appellant walked across the street to another apartment complex. When questioned by detectives, Appellant initially denied but later admitted he was the person the maintenance man had seen.

Around 11:00 a.m., Appellant telephoned Torres's cousin, James Daniel Garza, and repeatedly told him, "They're gone." Garza described Appellant's voice as "scared." Garza eventually concluded Appellant was referring to Torres, and after calling several family members, he immediately went to the trap house.

Around the same time, Appellant reported to his probation class, and after some prompting, he revealed that he had found two family members shot in the head. Appellant later told the detectives investigating the deaths that he told the probation social worker that he had just come home from a night out at XTC—an exotic dancers' club from Appellant's description—and found two people dead in

5

his apartment. After some further prompting from the social worker, at 11:44 a.m., Appellant himself made a 911 call.

Around noon, Reta telephoned Esparza to tell her that Torres and Charles had been killed. Esparza's attempts to call Trevino and De Jesus failed; she denied trying to call Appellant.

Around 2:00 p.m. that afternoon, Appellant telephoned Esparza and, crying, told her repeatedly, "I did it." Esparza understood Appellant to mean that he had killed Torres and Charles. When Esparza told Appellant not to take the blame if he did not do it, Appellant remained quiet for a couple minutes; he then repeated his refrain, "I did it. I did it." Esparza thought that there was something about Appellant's voice that suggested someone was forcing him to take the blame. Esparza thought somebody was threatening Appellant and did not believe that Appellant had killed Torres and Charles. When questioned by detectives about this call, Appellant initially denied but later admitted calling Esparza and telling her that he had killed Torres. Appellant maintained, however, that he had told Esparza that to protect her from De Jesus.

Trevino talked with Esparza later that day and encouraged her to lie to the police. Later Trevino and Esparza met, and after an argument, Esparza agreed to place a pistol and some ammunition that he had brought with him in the trunk of her car. Still later that day, De Jesus called Esparza and instructed her to bring the pistol to him. De Jesus and Trevino later claimed that they threw the pistol into a lake.

6

At the trap house, the police found shotgun waddings and a number of shotgun pellets. Ballistic tests on the wadding and shot indicated that the victims may have been shot with a Taurus Judge revolver loaded with Winchester brand .410 shotgun shells.

When questioned by detectives, Appellant volunteered that De Jesus carried a Judge. Appellant explained to one of the detectives how he had seen De Jesus cleaning a Judge revolver and how he had seen "shotgun bullets."

Torres's autopsy showed that he had been shot twice in the head at close range by a weapon firing shotgun ammunition. The cause of death was multiple gunshot wounds, and the manner of death was homicide, that is, "death at the hands of another person." Charles's autopsy showed that she had been shot once in the back, once in the chest, and once to the right side of her face by the same type of weapon that had killed Torres. Like her husband, her cause of death was multiple gunshot wounds, and her manner of death was homicide.

During his interviews with detectives, Appellant gave many stories about what had happened that night. One of Appellant's stories was that he, Trevino, and De Jesus agreed to kill Torres. The three of them went to the trap house together, and De Jesus then entered and shot both Torres and Charles.

**APPELLANT ATTACKS THE SUFFICIENCY OF THE EVIDENCE**

In Appellant's sole issue, he contends the evidence is insufficient to support his conviction. Within his sufficiency complaint, Appellant advances several other arguments that we will address.

7

## STANDARD OF REVIEW

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* at 319, 99 S. Ct. at 2789; *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray*, 457 S.W.3d at 448. We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49.

Reversal on evidentiary sufficiency grounds is restricted to "the rare occurrence when a factfinder does not act rationally." *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *see Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014) (stating that a reviewing court should not act as a "thirteenth juror"). The appellate scales are weighted in favor of upholding a trial court's judgment of conviction. *Winfrey v. State*, 323 S.W.3d 875, 879 (Tex. Crim. App. 2010).

## DISCUSSION

Under section 19.03(a)(7)(A) of the penal code, a person commits capital murder if (1) the person (2) commits murder under section 19.02(b)(1) and the person (3) murders more than one person (4) during the same criminal transaction. *See* Tex. Penal Code Ann. § 19.03(a)(7)(A). A person commits murder under section 19.02(b)(1) if the person intentionally or knowingly causes the death of an individual. *See id.* § 19.02(b)(1) (West 2011). A person is criminally responsible for an offense committed by the conduct of another if the person, acting with the intent to promote or assist the commission of the offense, solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *See id.* § 7.02(a)(2) (West 2011). The jury charge included an instruction on the law of parties.

### Same Criminal Transaction

Appellant disputes that Torres and Charles were murdered during the same criminal transaction. Because the legislature did not define the term "same

criminal transaction," the court of criminal appeals has interpreted that phrase to mean "a continuous and uninterrupted chain of conduct occurring over a very short period of time . . . in a rapid sequence of unbroken events." *Rios v. State*, 846 S.W.2d 310, 314 (Tex. Crim. App. 1992), *cert. denied*, 507 U.S. 1051 (1993); *see Jackson v. State*, 17 S.W.3d 664, 669 (Tex. Crim. App. 2000). There was only one 911 call regarding gunshots on the morning of September 7, 2013. Additionally, Torres and Charles were killed in the same apartment by the same type of weapon. Moreover, based on Esparza's testimony that she understood Appellant and Trevino were talking about killing both Torres and Charles, and based on the evidence that Appellant, Trevino, and De Jesus left alone around 6:00 a.m. and that the 911 call regarding gunshots in the area of the trap house came in at 6:13 a.m., the jury could have reasonably inferred that Torres and Charles were killed in a continuous and uninterrupted chain over a very short time. Viewing the evidence in the light most favorable to the prosecution, we hold that any rational trier of fact could have found that Torres's and Charles's murders occurred during the same criminal transaction. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

### *Ambiguity of Admission*

Relying on *Walker v. State*, Appellant argues that his statement, "I did it," was too ambiguous to constitute an admission. 615 S.W.2d 728, 733 n.3 (Tex. Crim. App. 1981). We disagree.

10

In *Walker*, the court held that the only evidence connecting the defendant to the offense came from the accomplice witness; because there was no other evidence connecting the defendant to the offense, the accomplice witness's testimony, without which the evidence was insufficient to support the conviction, was not corroborated. *Id.* at 731–33. Footnote 3 in *Walker*, upon which Appellant relies, explains that the apparent reason for the inclusion of a charge on the law of circumstantial evidence in that case was because the defendant's statement, "I did it," was too vague to constitute direct evidence of an admission. *Id.* at 733 n.3. In Appellant's case, he is not complaining about the absence of a requested charge on the law of circumstantial evidence. Appellant's reliance upon *Walker* is misplaced.

Regarding any purported ambiguity in Appellant's statement, "I did it," Esparza had no difficulty concluding Appellant was referring to the murders, and Appellant himself later admitted to the detectives that he told Esparza that he had admitted killing Torres. Because Torres and Charles were killed in the same criminal transaction, Appellant also implicitly admitted killing Charles. Although an ambiguous confession may be only circumstantial evidence, circumstantial evidence is as probative as direct evidence when establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Herrera v. State*, No. 13-11-00036-CR, 2011 WL 5005581, at *8 (Tex. App.—Corpus Christi Oct. 20, 2011,

11

pet. ref'd) (mem. op., not designated for publication) (relying on *Hooper*, 214 S.W.3d at 13).

*Accomplice Testimony*

Appellant also argues that Esparza was an accomplice and that her testimony was not corroborated; therefore, her testimony must be disregarded. Absent Esparza's testimony, Appellant contends there was nothing connecting him to the offense. We disagree.

The accomplice-witness rule is set out in Article 38.14 of the code of criminal procedure: "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed[,] and the corroboration is not sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005).

When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). To meet the requirements of the rule, the corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself. *Id.* Nor is it necessary for the corroborating evidence to directly link the accused to the commission of the offense. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999), *cert.*

12

*denied*, 528 U.S. 1082 (2000). Rather, the direct or circumstantial evidence must show that rational jurors could have found that it sufficiently tended to connect the accused to the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009).

The sufficiency of nonaccomplice evidence is judged according to the particular facts and circumstances of each case. *Smith*, 332 S.W.3d at 442; *Malone*, 253 S.W.3d at 257. Circumstances that are apparently insignificant may constitute sufficient evidence of corroboration. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999).

Appellant contends that *Cruz v. State* best exemplifies why, absent the accomplice testimony, nothing connects him to the offense. 690 S.W.2d 246 (Tex. Crim. App. 1985). In *Cruz*, the accomplice witness, the defendant, and the defendant's wife were transients and were living in a building on the complainant's property. *Id.* at 248. The complainant was shot and killed in his home sometime between Christmas Eve and December 27. *Id.* at 250. A friend of the complainant testified he found the building in which the accomplice witness, the defendant, and the defendant's wife were living empty on Christmas Day. *Id.* at 249. Excluding the testimony of the accomplice witness, that evidence was the extent of the State's case against the defendant, and the court held that the State failed to connect the defendant to the offense and ordered an acquittal. *Id.* at 251.

In contrast, Appellant told the detectives that he, Trevino, and De Jesus agreed to kill Torres, that they went to the apartment together, that at least Appellant and De Jesus entered the apartment, and that he watched as De Jesus shot both Torres and Charles. Appellant also admitted to the detectives that he told Esparza that he had killed Torres. Appellant's own admissions to the detectives connect him to the offense. We hold that *Cruz* is distinguishable and that the jury was free to consider Esparza's testimony.[3]

*Extrajudicial Confessions and the Corpus Delicti Rule*

Appellant next argues that extrajudicial confessions are insufficient to support a conviction. He relies on *Marsh v. State*, 342 S.W.2d 435 (Tex. Crim. App. 1961); *Board v. State*, 320 S.W.2d 668 (Tex. Crim. App. 1959); *Watson v. State*, 227 S.W.2d 559 (Tex. Crim. App. 1950); and *Jacks v. State*, 109 S.W.2d 762 (Tex. Crim. App. 1937). All of these cases are best understood in the context of the corpus delicti rule. The corpus delicti rule still applies in Texas. *See Miller v. State*, 457 S.W.3d 919, 926 (Tex. Crim. App. 2015).

The corpus delicti rule affects the evidentiary sufficiency analysis in cases in which there is an extrajudicial confession. *See id.* at 924 (citing *Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013)). The rule provides that, "[w]hen the burden of proof is 'beyond a reasonable doubt,' a defendant's

---

[3]The State argues that Esparza was not an accomplice. A witness is not deemed an accomplice because she knew of the crime but failed to disclose it or even concealed it. *Smith*, 332 S.W.3d at 439. Because of our disposition, we need not resolve that issue.

14

extrajudicial confession does not constitute legally sufficient evidence of guilt absent independent evidence of the corpus delicti." *Hacker*, 389 S.W.3d at 865. The corpus delicti rule requires that there must be "evidence independent of a defendant's extrajudicial confession show[ing] that the 'essential nature' of the charged crime was committed by someone." *Id.*, 389 S.W.3d at 866. The purpose of the corpus delicti rule is to ensure "that a person would not be convicted based solely on his own false confession to a crime that never occurred." *See Carrizales v. State*, 414 S.W.3d 737, 740 (Tex. Crim. App. 2013).

*Marsh*

In *Marsh*, the only evidence of the defendant's guilt was the defendant's extrajudicial confessions. 342 S.W.2d at 435. The court held that extrajudicial confessions were not sufficient proof of the corpus delicti, that is, evidence that an offense had actually occurred, and reversed the defendant's conviction. *Id.* at 435. The court noted that the complainant, who could have provided evidence that the alleged offense had, in fact, occurred, never testified. *Id.* at 435. In Appellant's case, there is abundant evidence of the corpus delicti—the murder of Torres and Charles during the same criminal transaction. *Marsh* is distinguishable.

*Board*

In *Board*, the child complainant did not testify, the State introduced into evidence photographs of the child complainant's injuries, and one witness testified regarding what the defendant—the child complainant's adoptive

15

mother—had told her. 320 S.W.2d at 669. Although the defendant admitted to the testifying witness that she had whipped the child with a switch and rubbed the child's face in the child's own vomit after forcing the child to eat, the defendant denied brutally beating the child. *Id.* The court wrote that although the defendant admitted engaging in reprehensible conduct, she effectively denied causing the child's injuries depicted in the photographs. *Id.* Although there was evidence the child was injured, there was no evidence the defendant had caused those injuries, so the court reversed the conviction. *Id.* In *Board*, although there was evidence that someone had beaten the child, the defendant never admitted that she was the person who beat her. In Appellant's case, there was evidence someone had killed Torres and Charles, and Appellant admitted killing or participating in the killing of Torres and Charles. *Board* is distinguishable.

### *Watson*

In *Watson*, the defendant was convicted of robbery by assault. 227 S.W.2d at 560. The defendant signed a confession that he pressed against the complainant's neck until she went limp and then took her money. *Id.* He argued that, apart from his confession, there was no evidence he did anything other than take money from a dead person. *Id.* at 562. The court wrote that a confession, absent proof of a corpus delicti, was insufficient. *Id.* To use the defendant's confession, there had to be evidence that the crime charged was committed by someone—the corpus delicti. *Id.* The defendant argued that the complainant had eaten a can of beets before going to bed and died of natural causes, he

16

found her dead, and he then took her money. *Id.* at 563. The court, writing that the evidence showing that the complainant was healthy when she went to bed and dead the next morning, coupled with the fact her money was gone, disagreed and held that the evidence was sufficient to establish the corpus delicti independent of the defendant's confession. *Id.* *Watson* is a case in which the defendant admitted committing the offense, but he argued, unsuccessfully, that there was no evidence apart from his confession that a crime had occurred. In contrast, our case has evidence of a capital murder and Appellant's confession that he was involved in the capital murder. *Watson* illustrates why Appellant's confessions are sufficient to support his conviction.

<em>Jacks</em>

In *Jacks*, the defendant was convicted of a theft of hogs. 109 S.W.2d at 763. The complainant testified that eight of his hogs went missing, and when the complainant asked the defendant whether he had butchered any hogs recently, the defendant responded that he had butchered eight but the eight he had butchered were his own. *Id.* The complainant maintained the hogs that the defendant butchered were actually the complainant's. *Id.* A number of other witnesses testified that they had seen the complainant's hogs, and then they had stopped seeing them, but none of them had an explanation as to what happened to the hogs. *Id.* The defendant himself did not testify. *Id.* The court wrote,

> As a general rule, where it is shown that a crime was committed by some one and the accused's connection therewith is shown by his confession, it is sufficient to justify his conviction; but a party cannot

17

be convicted upon his extrajudicial confession alone. However, we do not regard [the defendant's] statement to [the complainant] as a confession, because he did not confess to his guilt or his connection with the theft of any hogs.

*Id.* In other words, the court accepted the proposition that someone had stolen the complainant's hogs, and the court acknowledged that if the defendant had confessed to stealing the hogs, the defendant's confession would have been sufficient, but the court held that the defendant had never confessed to stealing anything.[4] Under those facts, the court wrote that the trial court should have instructed the jury to return a verdict of not guilty, as requested. *Id.* In *Jacks*, there was never an extrajudicial confession, whereas in Appellant's case, there are at least two. *Jacks* is distinguishable.

*The Reliability of Confessions Generally*

Appellant cites *Benavidez* for the proposition that confessions have little probative value. *Benavidez v. State*, 154 S.W.2d 260 (1941), *cert. denied*, 315 U.S. 811 (1942). In *Benavidez*, the court wrote,

Attack is also made on the confession introduced in this case and the manner in which it was obtained. It will be sufficient to say that the record does not contain undisputed facts nor overshadowing circumstances which would warrant this court in reaching a conclusion different to that found by the trial court. We may grant the correctness of the argument that confessions are frequently of doubtful probative force; that they may not in good conscience be considered at all times worth very much to prove the truth of the facts which they assert. There is no way to measure the force and effect of fear, nor the weight on the mind of an individual which the

---

[4]In an opinion on the State's motion for rehearing, the court stood by its original opinion. 109 S.W.2d at 763–64 (op. on reh'g).

18

persuasion applied may have. Some statements "obtained" by investigating officers may appear to be preposterous, but we have no means of so branding the statement in this case as is contended by appellant. On the other hand it is a well settled proposition of law that when a confession leads to the discovery of physical facts and other undisputed evidence and circumstances which unerringly point to the guilt of the accused verity is imputed to such statement. Such is the case before us. The implements used in the commission of the crime that were discovered following the confession of appellant, as a direct result of it, and their force as evidence in this case furnish a reliable source of information which, independent of the statement itself, stand out as indisputable evidence pointing to the guilt of appellant and to the exclusion of all others.

*Id.* at 267–68. The court in *Benavidez* acknowledged that, on occasion, a confession might be suspect, but it also wrote that Benavidez's confession proved quite probative. We decline to hold, as Appellant argues, that confessions are categorically suspect and unreliable.

*Other Reasonable Hypotheses*

Appellant contends that in the absence of any direct proof that Appellant committed the offense, his conviction cannot be sustained unless the circumstantial evidence excludes every other reasonable hypothesis except his guilt. Appellant argues that the State failed to disprove that De Jesus was the killer without Appellant's complicity. One version of the events as related by Appellant to the detectives was that De Jesus killed Torres and Charles while Trevino and Appellant were waiting in the car and that De Jesus thereafter threatened Appellant and his family. Appellant's mother testified that Appellant came to her house on September 7, 2013, and was very afraid of De Jesus. Appellant's sister testified that both her mother and Appellant came to her house

19

because people were driving around her mother's house looking for Appellant and that her mother and Appellant were afraid that De Jesus or someone else might hurt them. Esparza also testified that there was something about Appellant's voice that made her think that someone was coercing Appellant into taking the blame. In conjunction with this argument, Appellant further argues that even though he told the detectives that he, Trevino, and De Jesus returned to the trap house, there is no evidence that he was helping De Jesus get into the trap house simply by knocking on the door.

The outstanding reasonable hypothesis theory is not applicable in an evidentiary sufficiency review. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) ("For the evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with the defendant's guilt."); *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012) (discounting an alternative hypothesis that a court of appeals had proposed with respect to a theft conviction). It is unnecessary for every fact to point directly and independently to the guilt of the accused; it is enough if the finding of guilt is warranted by the cumulative force of the incriminating evidence. *Dobbs*, 434 S.W.3d at 170; *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013). The court of criminal appeals has thus disavowed the reasonable-alterative-hypothesis construct. *See Ramsey v. State*, 473 S.W.3d 805, 811 (Tex. Crim. App. 2015). The proof-beyond-a-reasonable-doubt standard does not require the State to disprove every conceivable alternative to a defendant's guilt. *Id.* at 808.

Our focus remains on whether there was sufficient evidence to support the jury's verdict of guilty.

*Whether Appellant Committed the Offense*

Appellant contends that the evidence is insufficient to show that he was the person who killed Torres and Charles or to show that he was a party to the killing of Torres and Charles. We disagree.

Appellant called Esparza the same day as the murders and, while crying, repeatedly told her, "I did it." Esparza explained that she understood Appellant to mean that he had killed Torres and Charles. Esparza, however, questioned whether Appellant really killed Torres and Charles because she detected something in his voice that suggested coercion. Appellant himself admitted to detectives that he had told Esparza that he had killed Torres, but he asserted that he had told her that only to protect her from De Jesus.

A jury may choose to believe some witnesses but choose to disbelieve others; similarly, a jury may believe some portions of a witness's testimony but reject other portions of the same witness's testimony. *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986); *Pope v. State*, Nos. 02-08-00235-CR, 02-08-00236-CR, 02-08-00237-CR, 2009 WL 3416459, at *1 (Tex. App.—Fort Worth Oct. 22, 2009, pet. ref'd) (mem. op., not designated for publication) (citing *Losada*, 721 S.W.2d at 309). The jury was, therefore, free to believe Esparza when she testified that Appellant admitted committing the offense to her and disbelieve her when she speculated that Appellant's confession was involuntary.

In the same way, the jury was free to believe Appellant when he admitted telling Esparza that he had committed the offense and disbelieve him when he had tried to explain his admission away.

Additionally, Appellant gave a separate admission to the detectives that he, Trevino, and De Jesus had agreed to kill Torres, the three of them went to the trap house, and that De Jesus then shot Torres and Charles. Because Appellant was also charged as a party, the jury was free to believe Appellant's admission and convict him as a party. Although Appellant gave many variations of his story to the detectives, in one version Appellant admitted that De Jesus was the one spurring him and Trevino on to put a stop to Torres's abuses, that Appellant had the Judge when they went back to the trap house, that Appellant told Charles that he was just there to get his stuff quickly, that Charles let him in, and that Appellant was standing beside De Jesus when De Jesus gunned down both Torres and Charles.[5] Appellant asserted to the detectives that he tried to back out, but the jury did not have to believe that portion of his statement. *See Losada*, 721 S.W.2d at 309; *Pope*, 2009 WL 3416459, at *1. Viewing the evidence in the light most favorable to the verdict, Appellant was not at the trap

_____

[5]Earlier in the interview, when Appellant asserted that it was Charles who opened the door, one of the detectives openly expressed disbelief, challenged Appellant, and stated in a matter-of-fact manner that Torres never allowed Charles to open the door, but Appellant stayed with his story that it was Charles who opened the door.

house to thwart the killings, he was not there to witness the killings for posterity, and he was not there by happenstance.

Although motive and opportunity are not elements of a criminal offense, they can be circumstances that are indicative of guilt and therefore may be properly considered in an evidentiary sufficiency review. *Temple*, 390 S.W.3d at 360. The evidence showed that Torres was angry at Appellant and Trevino and pointed the gun at them, not De Jesus. Appellant, far more so than Trevino, was the one Torres humiliated in front of everyone else present. Appellant was the one on his knees. Appellant was the one saying repeatedly "Yes, sir" to Torres's rants. The evidence also showed that Appellant and Trevino, not De Jesus, were the ones wanting to return to the trap house to "jump" Torres. And the evidence was that Appellant and Trevino, not De Jesus, were the ones arguing about which one of them would be the one who would "do it." When coupled with Appellant's admission to Esparza that he was the one who "did it," the jury was free to find that Appellant's admission to the detectives that he was a party to the killings but not the shooter was an attempt to shift the bulk of the blame—if not all of the blame—on De Jesus.

We hold that, when viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Murray*, 457 S.W.3d at 448. The evidence is, therefore, sufficient.

We overrule Appellant's sole issue.

23

## CONCLUSION

We affirm the trial court's judgment.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DAUPHINOT, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  December 30, 2016