COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| RICCI DARRELL LOVE, JR., AKA: RICCI DARRELL LOVE, | § | No. 08-13-00128-CR |
| | § | |
| Appellant, | § | Appeal from the |
| | § | 372nd District Court |
| V. | § | of Tarrant County, Texas |
| THE STATE OF TEXAS, | § | |
| | § | (TC# 1285361D) |
| Appellee. | | |

## O P I N I O N[1]

Appellant, Ricci Darrell Love, Jr., appeals the trial court's judgment adjudicating him guilty of aggravated assault with a deadly weapon, to-wit: a firearm, and sentencing him to fifteen years' confinement. In two issues, Appellant argues the trial court abused its discretion in revoking his community supervision for violating conditions by finding he committed three new offenses: (1) robbery; (2) aggravated robbery; and (3) burglary of a habitation, based on legally insufficient evidence. Appellant urges the evidence is insufficient because: (1) the only two eyewitnesses were not credible; and (2) the lack of any evidence corroborating the unreliable eyewitnesses' testimony. We affirm.

### FACTUAL HISTORY AND PROCEDURAL BACKGROUND

Appellant pled guilty and was placed on five years deferred adjudication on June 27, 2012

---

[1] This case was transferred to this Court from the Second Court of Appeals pursuant to an order issued by the Supreme Court of Texas. *See* TEX.GOV'T CODE ANN. § 73.001 (West 2013).

for aggravated assault with a deadly weapon, to-wit: a firearm. Two of the conditions of Appellant's probation were that he commit "no offense against the laws of this State" and "[d]o not possess, transport . . . any firearms . . . ."

On December 5, 2012, the State filed a "Petition to Proceed to Adjudication" alleging six violations. Prior to the revocation hearing, the State waived two of the violation allegations, leaving four to be heard by the trial court. The pertinent four violations alleged that Appellant in Tarrant County and the State of Texas on November 15, 2012: (paragraph 1) committed robbery by threatening or placing Phillip Sadler in fear of imminent bodily injury or death and Appellant used or exhibited a deadly weapon, to-wit: a firearm; (paragraph 2) committed theft by threatening or placing Carl Fleetwood in fear of imminent bodily injury or death and Appellant used or exhibited a deadly weapon, to-wit: a firearm; (paragraph 3) committed burglary of a habitation without consent of Phillip Sadler with intent to commit aggravated robbery with a deadly weapon; and (paragraph 4) possessed a firearm. The robbery victims and the two eyewitnesses, Phillip Sadler and Carl Fleetwood, testified at the hearing. Appellant entered a plea of not true to the four violations.

### Sadler's Testimony

On November 15, 2012, sometime in the early afternoon, Sadler was in his room at the Relax Inn in Fort Worth with his step-father, Fleetwood. Sadler had cracked opened the door for some fresh air, lying on his bed, playing on his PlayStation, when Appellant and an accomplice burst into the room. Sadler identified Appellant as a person he knew as "Slim," however, he was unacquainted with Appellant's accomplice. According to Sadler, Appellant jumped on top of him and put a chrome pistol to his head. Appellant began making demands for money and told Sadler

2

"just give it up, just give whatever you have up." When Sadler responded that he did not have anything, Appellant pressed the pistol up against Sadler's left temple area. Sadler finally told Appellant that there was a safe under the bed and stated "if [you] wants it, [you] can have it." Sadler testified he was in fear of being seriously hurt or killed. Sadler observed Appellant was wearing a plaid red and black jacket. As soon as Sadler informed the duo that the safe was underneath his bed, Appellant instructed his accomplice to grab it. In addition to making off with the safe, Appellant grabbed Sadler's cell phone while his accomplice took Fleetwood's cell phone as they ran out of the motel room.

Next, Sadler saw a two-door, gray-colored Mustang with tinted windows leave the motel parking lot within seconds after Appellant left the room. Sadler stated that in his prior contact with Appellant, he knew that Appellant was associated with a gray Mustang, very similar to the one he saw driving out of the motel's parking lot. Sadler stated there was less than one hundred dollars in the safe. Sadler called 9-1-1, and the police were able to locate the Appellant within the hour. Sadler later identified Appellant as one of the individuals that robbed him that day. Sadler also testified that Appellant was still wearing the same clothes from the time of robbery to when Sadler later identified him for the Fort Worth police.

Upon cross-examination, Sadler acknowledged that he has known Appellant for years, as they had been neighbors in the same complex. Further, Sadler testified he had been convicted of a felony, possession of crack cocaine, in Florida in 2002. Sadler admitted he has smoked marijuana in the past, however he has never sold marijuana nor purchased it in large quantities.

At this point in the hearing, the prosecutors disclosed to the Court that Sadler had indicated to them in a pretrial meeting that Sadler "does use marijuana, that he has bought marijuana in large

3

quantities prior to this date and that he has specifically bought marijuana from this defendant, Slim." The prosecutors informed the Court that they had instructed Sadler not to volunteer any of that information or talk about it. The prosecutors also confirmed that Sadler had confirmed those facts to police. The trial judge declined to admonish Sadler, but advised the prosecutor to ask the appropriate questions to show whether Sadler was confused about the State's instructions. The trial judge stated he would "decide whether he's [Sadler] confused or mistaken or scared or lying or any of the other options that are available with inconsistent answers, balancing against the entire record and testimony." When Sadler was questioned as to whether he purchased marijuana in large quantities, he answered "No majorly large quantities to where somebody would want to come and try to take something, no." Sadler denied purchasing large quantities of marijuana and could not recall telling the prosecutor that he had done so. Eventually, Sadler clarified that he considered two to five ounces a large quantity to him. Sadler reiterated that he had smoked marijuana in the past and purchased marijuana but not in quantities that he considered large.

### *Fleetwood's Testimony*

Fleetwood confirmed he was in the motel room with Sadler, his step-son. Fleetwood observed a gray Mustang creep through the motel parking lot slowly two times. Soon after that, according to Fleetwood, Appellant "bolted through the door." Appellant was positively identified by Fleetwood as the individual who entered the motel room that day. Fleetwood recalled that Appellant was wearing a red and black checkered jacket or overshirt and holding a gun in his hand. Fleetwood explained that once Appellant was inside the room, he pushed Sadler down on the bed and put the gun up against his head, on the left side. Fleetwood stated that Appellant kept asking "where is it at" and Sadler replying "it's under the bed[.]" Appellant told

4

Sadler "If it's not, I am going to shoot." Fleetwood was on the phone as Appellant and his accomplice entered the motel room. The accomplice was also holding a weapon. When Appellant noticed Fleetwood sitting in the room, he told his accomplice, "what is he doing on the phone, he's probably calling the police." Appellant then directed his accomplice "If he moves, shoot him." The accomplice then took Fleetwood's phone. Appellant told the accomplice to get the safe from underneath the motel bed. Sadler's cell phone was also taken. Appellant told his accomplice to "check it out[.]" The accomplice opened the safe and then replied "it's here, it's here." As Appellant and his accomplice are leaving the room they tell the victims, if either one of them moved "we're going to start shooting."

Fleetwood opened the motel door about fifteen to twenty seconds after Appellant leaves and saw them go down the breezeway toward the back of the motel. Then he observed the same gray Mustang from earlier go by in the parking lot, only faster than it did earlier. Fleetwood said he and Sadler both recognized who was in the gray Mustang. Fleetwood admitted he had been involved in thefts in 1990, 1993, 2000; burglary of a vehicle in 2002; and a theft under $150 in 2002. Fleetwood conceded that he knew there was marijuana in the safe. Fleetwood also acknowledged that Sadler had been convicted of a cocaine offense in the past and that Sadler has been known to sell marijuana, and that people would drop by for short periods of time to the motel room. Fleetwood testified that he was sixty-three years' old, born in 1950, had served twenty-three years in the Marines and fifty-four months in Vietnam. Fleetwood testified he served in Vietnam from 1963 to 1965 and then 1969 until 1972.

### Corroborating Evidence

Sergeant Halfmann testified he was on patrol the day of the robbery. He observed a

5

two-door gray Mustang driving about one to two miles from the Relax Inn, minutes after the call went out regarding the robbery which referenced a gray Mustang. Sergeant Halfmann followed the gray Mustang until it voluntarily came to a stop and three individuals exited. He called to them, "come here a minute" and one took off running down the street, one moved to the driver's side door and one stood still. Sergeant Halfmann detained the one individual who did not flee. The gray Mustang then took off. Sergeant Halfmann could not identify the two individuals who fled, one by foot and one in the gray Mustang.

Lieutenant Stockton, who was following Halfmann in another vehicle, also observed the gray Mustang. Stockton saw two individuals run from where the gray Mustang had pulled over, so he followed them in his vehicle. After about two blocks, Stockton eventually left his vehicle and pursued one of the individuals on foot. He lost that subject, returned to his vehicle and began driving in the area. While driving, Stockton observed a tall, slender black male wearing a "black and red checkered shirt, or jacket . . ." walking down the street. Stockton did not stop or detain this individual because he did not have any information pertaining to an individual of that description. However, after being shown State's Exhibit #1, Stockton identified the individual in the photograph as the same individual he saw that day. State's Exhibit #1 is a photograph of Appellant wearing a checkered red and black plaid shirt. Stockton testified he saw Appellant walking about fifty yards from a residence in which a gray Mustang, still running, was abandoned and thirty yards from a backyard where the safe was found.

Officer Edward Martinez arrested Appellant and made a positive identification of him in the courtroom and identified State's Exhibit #1 as a photograph of Appellant. Martinez had received a description from dispatch to look for a tall black male. Martinez made contact with

6

Appellant to obtain some basic information, but let Appellant go when Stockton told him that Appellant was not the person they were looking for. Soon after, Martinez received an update to look for a "very tall black male, wearing some type of checkered red jacket[.]" Martinez returned to search for Appellant and was informed that he was last seen leaving in a van. Martinez found the van and started following it. The vehicle stopped at a store parking lot and Officer Martinez approached the van and asked Appellant to step outside the van. Martinez detains Appellant. The van had stopped less than a quarter mile from the Relax Inn. Martinez responded to the location where he found the Mustang abandoned in a yard, still running, with the tires blown out.

Detective James Desmarais was the robbery detective assigned to Appellant's case. Desmarais identified State's Exhibit #1 as accurately depicting Appellant on the day of the robbery. Desmarais spoke with Sadler for a description of the individual involved in the robbery. Desmarais testified that the individual depicted in the photograph fit the description that Sadler had given him. Sadler told Det. Desmarais he knew Appellant as "Slim[.]" Desmarais transported Sadler to the parking lot Appellant was being held. As they approached the parking lot where Appellant was standing outside, Desmarais said Sadler "immediately started getting excited and saying, 'That's Slim. That's him right there.'" Sadler positively identified Appellant as one of the individuals who robbed him that day. Desmarais also noted that the recovered Mustang matched the vehicle description given by Sadler and Fleetwood.

Desmarais also received a DVD from the Relax Inn of video taken from the premises on the day of the robbery. The trial judge after reviewing the DVD, stated:

> I observed two different camera views. One from an angle showing the parking lot, showing a gray, silver-greenish Mustang enter and leave the parking lot. And a different angle showed a row of rooms, which the detective pointed out, fourth [door] from the left on the bottom. And I observed individuals come from

7

around the corner, rush into the room and out of the room in a span of about 40 to 45 seconds from entry to exit. And then other people later come out of the room, walk out, look, go in and out of the room a couple of times.

The trial judge also stated that the figures on the DVD were about half inch or less, but there was "no way you could make a facial identification based" on the video. However, the court did observe "red and black shirts" on the DVD recording.

Desmarais testified that the abandoned Mustang vehicle was impounded pending a search warrant. Desmarais also told the trial court that the Mustang in the DVD matched the impounded vehicle. A search of the vehicle revealed a simulated gun, State's Exhibit 4, a semi-automatic 45-caliber pistol, State's Exhibit 5, and two cell phones. The 45-caliber pistol had live rounds that were removed from the pistol chamber when the weapon was found. A third cell phone was recovered on Appellant's person at the time of his arrest.

On cross-examination, Desmarais testified that the faces in the DVD cannot be clearly seen, however, he believed the tall black male was Appellant. Desmarais stated that Sadler had admitted he was using marijuana that day, he buys marijuana in large quantities and that he knew Appellant "through drug dealing[.]"

Appellant's theory of the case was the night before the robbery, Sadler and he were at Appellant's house when Sadler took Appellant's cell phone, money and marijuana. Further, Sadler and Appellant knew each other from shooting dice, they had a mutual interest in buying and selling marijuana, and they had been shooting craps the morning of the robbery. According to defense counsel, the marijuana in the safe belonged to Appellant, not Sadler, but Sadler's gun was in the safe. Defense counsel, through her questioning, posited the gun that was involved belonged to Sadler, not Appellant. However, no evidence was introduced to support any of Appellant's

8

assertions.

The trial court after closing weighed the evidence in this fashion:

I have re-reviewed the video. I've looked at State's 1. And I've looked at the -- compared the appearance of the appearance in State's 1 with the miniaturized, if you will, people depicted on the face of the surveillance video, particularly the clothing, particularly the shirts, particularly heights, and locations relative to door frames. And in all fairness to the Defense position and the strategies, the argument being made, its mostly, I'm sorry to these people who were robbed, my client was at Walt Disney World with his friends or watching the ball game, as opposed to they weren't robbed. These people are lying about this. This is a debt dispute or a persona complaint that a robbery allegation is made, for whatever reason, motive not clear but implied due to gambling debts or other things, that there is no evidence of, there are just questions asked and answered no. But to totally be fair to the Defense's position, using innuendo based upon the inconsistencies in some of the evidence and statements, particularly the, quite frankly, unimpressive attitude [to] the Court of the primary, first-named injured party had even responding to simple request to please quit talking over people and the eyes rolling independent of the -- not knowing anything about marijuana until it's thrown in their face and admitting it.

And there are two clear common sense implications why of the Defendant [sic] wouldn't want to talk about the marijuana and one is that it's not theirs, the Defendant was doing a repo, and the other is I don't want to sit here and tell someone in a black robe in a court and confess to being a drug dealer and end up with a charge after you are a victim of a robbery and now get charged as a drug dealer. There's no immunity, there is no other issues. Quite frankly, if he was a drug dealer, maybe he needed to talk to a lawyer independently before he testified. If what his father says is true, maybe in hindsight him already being off the stand saying no to all those questions, other than possession, which I understand statutes and limitations and absence of evidence means there's probably no case, or at least in a state court.

.   .   .

On the other hand, his descriptions of Marine Corps issues and description of weapons is totally consistent with an ex-Marine. . . . [Q]uite frankly, a description, as I expect from a trained Marine, of a dull gray in color semi-automatic weapon is a perfect description of what I believe is a training pistol, not a toy. It's heavy metal, it's made to shoot. I believe this weapon that's State's Exhibit 4 is something like you used to train officers, so someone doesn't have a real weapon when you're training people how to react or how to disarm assailants where someone can't accidently get shot at or as a slip it through the airport TSA-type, same weight, same dimensions, same X-ray characteristics. I

9

don't believe that's a toy. I believe it's something that's designed for training to look, to mimic a regular weapon. It doesn't matter that's not a firearm. That's not in dispute. But the description of the father fits it like a glove. The description of -- if I'm to trust that description of the other person having a black handgun, a revolver, not an oversized piece of crap, cheap manufactured .45, loaded or not, I believe if I can trust the -- must trust the description of a dull silver semi-automatic in the hands of the person who had his son on the bed with a gun at their head, I cannot trust that description without trusting a black revolver from a person then I'm asked to trust knows the difference between gun A and gun B.

So gun [State's Exhibit] five, I do not believe there's evidence supporting its use, based on its size and based on its description, which does not mean that the second suspect did not possess a black revolver that just happened not to be in the car or recovered, any more than the second suspect, who's never been recovered or identified.

.                              .                              .

[A]ll types of other things, including a safe and a person in a checkered shirt in the vicinity.

There's all kinds of evidence of being phones recovered, but no evidence any phone was identified by anyone coming from this specific robbery. No one was shown a phone, independent of the scientific evidence. But having said all those things, the video shows a person in a black and white checked-type plaid shirt come around the corner from the area of a vehicle, meeting the description of the complainants, not walking up to a room in a jovial fashion, but it looked like a SWAT team raid because of the way they paused and sprung in the room, in and out in seconds. And you don't have to be in a hurry to run in and run out, to get back the marijuana that's rightfully yours, or collect a gambling debt. You don't have to run in and out. And you certainly don't have to run when a police officer says, hey, I need to talk to you, you don't need to run and split, whether there are other reasonable inferences, other than we just finished a rip-off or we just hit a lick. Maybe there are inferences that, oops, I'm on probation and hanging around people with guns and dope or other things and I don't want to get caught. And I can see that.

But in the context of the mechanical and the methodical way that the room was hit on the video, the flight afterwards and within minutes fleeing the officers, the silver weapon in the floorboard of the vehicle that matches the description and unrelated weapon in the vehicle, three people fleeing, two people saying they were threatened with violence, and in all fairness, the last time I looked, after I fell off my turnip truck in my last 30 years, I have just seen scores and scores of robbery that 'give me that' can mean the dope or the money or both or the jewelry or whatever is traded for the dope. 'That' means what you have. 'That' can mean the safe. But people rip people off every day. And even your own argument, which I respect, is there were guns to protect the dope from what robbers who'd

10

want to take the dope. And usually I don't see people pulling armed robberies to steal 'not that much' marijuana. And for the same reason usually you don't see people armed selling weed because the consequences of an incredibly serious state or federal charge for having a gun over a little weed is not worth the risk. You let them take the weed. And people are generally not shooting up small-time marijuana deal operations, as opposed to major drug houses where people are afraid of rival gangs and groups coming in and killing them and taking their property or their stash, but anything is possible.

So when all is said and done, balancing all the evidence, questioning and challenging and having concerns about the credibility of the testimony of Phillip Sadler, including, but not limited to, his inconsistent statements, questioning and balancing the testimony of Carl Fleetwood, having the fortuitous benefit of a video of a crime scene showing the before and after and the review of evidence in the vicinity of the vehicle that the Defendant is not physical evidence tied to but circumstantially tied to through all the totality of the evidence.

.                    .                    .

And I'm telling you what the son said here today, I didn't see, I didn't know, yes, to the cops, no, I don't know, but I have no doubt of what happened to Carl, whether Phillip claims to have been aware of it or concerned about his father's life or his safety on the stand, Carl didn't mince words. And I found him to be a challenge, but credible witness.

Phillip, I found credible enough, in balancing his testimony with all the evidence, to find the lesser.

.                    .                    .

And as to Four, there's no doubt in my mind that the weapon possessed by the Defendant is the practice or simulated firearm. The grounds on the petition says do not possess, transport or purchase -- transport would be an issue, but the allegation just says possess, it doesn't say transport. I don't think the black gun in the car -- I'm not satisfied at all trusting the Marine being a revolver and clearly knowing the difference in instruction, I don't think the black gun in the car might have been involved, but it wouldn't surprise me if the driver of the car had a black gun, the third missing person. But I don't think the law of parties -- I'm not clear the law of parties applies to probation violations on possessing. If it does, you're clearly -- Paragraph Four is absolutely true based on the actions of what the co-defendant does as regards to the father.

But as a precaution I'll err on the side of caution and I'll find not true the possession of firearm [paragraph 4]. Because I'm looking at that from a pleading of what did he exercise immediate care, custody and control over. And if I'm wrong on this, it should be true if you're responsible as a party of the other person's actions. But I'm just not totally clear that's the law as to specific -- versus that law

violations, which you look to the Penal Code to determine whether law of parties applies, as opposed to Code of Criminal Procedure rules for the actions of another. And I'm bending over backwards to be fair about that. And if I'm wrong, it doesn't matter. I clearly think you participated in three felonies and it's moot. It's not an issue.

But I'll err on the side of no clear -- I'm not aware of clear caselaw that says the law of parties that applies to a technical probation violation.

.          .          .

So by a preponderance of the evidence, I found you guilty of robbery as a lesser of the allegation in One, and Paragraphs Two and Three, as charged and as a party to the actions of the unidentified shorter person with the black revolver.

## Discussion

On appeal, Appellant complains that the evidence is legally insufficient to support a finding of true that he committed three new offenses: (1) robbery; (2) aggravated robbery; and (3) burglary of a habitation, based on Sadler's and Fleetwood's testimony. Appellant asserts the two witnesses' dearth of credibility renders the evidence legally insufficient when coupled with the lack of "significant corroboration[.]"

The State responds that Sadler's and Fleetwood's testimony is legally sufficient to uphold the trial court's finding of true to the three offenses and the adjudication of Appellant's guilt. Second, the State asserts the robbery victims' testimony is not required to be corroborated.

## Standard of Review

We review the trial court's decision to revoke community supervision for an abuse of discretion, taking into account the sufficiency of the evidence supporting the basis for revocation. *Hacker v. State,* 389 S.W.3d 860, 865 (Tex.Crim.App. 2013); *Rickels v. State,* 202 S.W.3d 759, 763 (Tex.Crim.App. 2006). Abuse of discretion occurs "only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree."

12

*Cantu v. State,* 842 S.W.2d 667, 682 (Tex.Crim.App. 1992). Probation may not be revoked upon a finding of any violation of any probationary condition other than that alleged in the motion to revoke or necessarily included within the allegations contained in the motion. *Caddell v. State,* 605 S.W.2d 275, 277 (Tex.Crim.App. 1980); *Pickett v. State,* 542 S.W.2d 868, 870 (Tex.Crim.App. 1976).

"The burden of proof at a probation revocation hearing is by a preponderance of the evidence." *Cobb v. State,* 851 S.W.2d 851, 874 (Tex.Crim.App. 1993); *see Hacker,* 389 S.W.3d at 864–65; *Little v. State,* 376 S.W.3d 217, 219 (Tex.App.--Fort Worth 2012, pet. ref'd). "In the probation-revocation context, 'a preponderance of the evidence' means 'that greater weight of the credible evidence which would create a reasonable belief that the defendant has violated a condition of his probation.'" *Hacker,* 389 S.W.3d at 865 (*quoting Rickels,* 202 S.W.3d at 764).

A revocation hearing is not a criminal prosecution and the degree of proof required to establish the truth of the allegation in a motion to revoke community supervision is not the same. *Hacker,* 389 S.W.3d at 864–65; *Black v. State,* 411 S.W.3d 25, 30 (Tex.App.--Houston [14th Dist.] 2013, no pet.); *see also Canseco v. State,* 199 S.W.3d 437, 438 (Tex.App.--Houston [1st Dist.] 2006, pet. ref'd). A defendant may be acquitted of a criminal offense and still have his community supervision revoked based on the same act because the standard of proof in a revocation proceeding is proof by a preponderance of the evidence, rather than beyond a reasonable doubt, as in a criminal trial. *See Polk v. State,* 729 S.W.2d 749, 750 n.1 (Tex.Crim.App. 1987)("[A]n acquittal in a criminal prosecution will not necessarily mandate a finding of 'not true' to a motion to revoke alleging commission of the identical offense, since the standard of proof in a revocation proceeding is proof by a preponderance, rather than beyond a

reasonable doubt, as in a criminal trial."); *Black,* 411 S.W.3d at 30 (defendant's acquittal of possession of marijuana charge following revocation of community supervision based on same act, without more, did not establish that revocation was an abuse of discretion); *see also Ex parte Lane,* 806 S.W.2d 336, 339 (Tex.App.--Fort Worth 1991, no pet.)("[A]n acquittal of a charged offense would not bar a subsequent revocation of probation based on the same allegation.").

In a community supervision revocation proceeding, the trial court is the trier of fact and the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Hacker,* 389 S.W.3d at 865. We review the evidence in the light most favorable to the court's ruling. *Cherry v. State,* 215 S.W.3d 917, 919 (Tex.App.--Fort Worth 2007, pet. ref'd). If the State fails to meet its burden of proof, the trial court abuses its discretion by revoking the community supervision. *Id.* at 919, (*citing Cardona v. State,* 665 S.W.2d 492, 493–94 (Tex.Crim.App. 1984)). Proof by a preponderance of the evidence of any one of the alleged violations of the conditions of community supervision is sufficient to support a revocation order. *Moore v. State,* 605 S.W.2d 924, 926 (Tex.Crim.App. 1980); *Sanchez v. State,* 603 S.W.2d 869, 871 (Tex.Crim.App. 1980).

## ANALYSIS

The evidence plainly shows the two eyewitnesses positively identify Appellant as one of the individuals that entered the motel room that day. Sadler and Fleetwood told police they were robbed of a safe and their phones. The video shows two black males, one tall, wearing a black checkered shirt, and another shorter individual, creeping with their backs flat to the motel wall toward a motel room door, then bursting into the room and forty-one seconds later running out to a Mustang that speeds off. The video corroborates the eye witnesses' testimony they were robbed.

14

The Mustang in the video is later identified as the same Mustang found abandoned. The safe and the abandoned Mustang, engine still running, were found not far from the Relax Inn. Likewise, Appellant was found to be walking thirty to fifty yards from the abandoned Mustang and safe, wearing the red and black checkered jacket matching Sadler's description. Once Appellant was detained, Sadler positively identified him. Not only does the evidence show the proximity in distance but also in time, Appellant was found and detained within an hour of the 9-1-1 call. The search of the Mustang reveals two cell phones and two weapons.

The trial judge carefully, cautiously weighed the evidence and credibility of the witnesses, taking into account Appellant's position that he was recovering his stolen marijuana. The trial court's pronouncements clearly analyze the supporting evidence that the judge found persuasive.

We cannot say that the trial court abused his discretion in finding by a preponderance of the evidence that Appellant violated his probation.

**CONCLUSION**

We find no reversible error in the case. The judgment is affirmed.

October 19, 2016

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Do Not Publish)

15