Opinion filed June 26, 2025



In The

# Eleventh Court of Appeals

_____

## No. 11-23-00130-CR
_____

### JOSEPH MICAH QUINTELA, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 441st District Court**
**Midland County, Texas**
**Trial Court Cause No. CR50092**

## M E M O R A N D U M   O P I N I O N

Appellant, Joseph Micah Quintela, appeals the revocation of his community supervision. On September 13, 2018, pursuant to a plea bargain agreement, Appellant pleaded guilty to two counts of the third-degree felony offense of failure to appear. *See* TEX. PENAL CODE ANN. § 38.10(a), (f) (West 2016). The trial court found Appellant guilty of both counts, sentenced him to confinement for a term of five years in the Institutional Division of the Texas Department of Criminal Justice

for each count, and assessed a $1,000 fine.  However, the trial court suspended the imposition of the sentences and placed Appellant on community supervision for a period of five years.

Appellant's community supervision was modified twice; once after the State filed a motion to revoke in March 2022, and again after the State filed a second motion to revoke in September 2022.

This appeal arises from the hearing on the State's third motion to revoke.  At the conclusion of the hearing, the trial court revoked Appellant's community supervision on both counts and sentenced him to confinement for a term of five years in the Institutional Division of the Texas Department of Criminal Justice on each count.

In his first issue, Appellant asserts that the trial court violated his due process rights when it failed to enter written findings of fact and conclusions of law in support of its decision to revoke his community supervision.  In his second issue, Appellant asserts that the trial court abused its discretion in revoking his community supervision because there was legally and factually insufficient evidence to establish that Appellant violated the terms and conditions by a preponderance of the evidence. We affirm.

*Background Facts*

In its third motion to revoke Appellant's community supervision, the State alleged that Appellant committed five violations of the terms and conditions of his probation.   The State alleged that each violation occurred on November 15, 2022. The State alleged that Appellant failed to abide by the requirement that he "shall commit no offense against the laws of this State or any other State or of the United States" when he (1) intentionally fled from a Midland police officer who was lawfully attempting to arrest or detain him with the knowledge that the police officer was a peace officer attempting to arrest or detain him; (2) intentionally and

2

knowingly by force, intimidation, or deception restrained Stephanie Gomez without her consent by "cornering her and physically blocking her from moving and exiting the bedroom"; (3) intentionally and knowingly prevented and interfered with Stephanie Gomez's ability to place a 9-1-1 emergency telephone call and to request emergency assistance "by following, interrupting, and attempting to take the phone" from her; (4) threatened to commit murder against Stephanie Gomez, a member of his family and/or household, with the intent to place her in fear of imminent serious bodily injury; and (5) intentionally and knowingly caused bodily injury to Stephanie Gomez, a member of his family and/or household and with whom he has had a dating relationship, by grabbing her from behind and "forcefully turning her body and limbs," having been previously convicted of an offense against a member of his family and/or household and with whom he has had a dating relationship. *See* PENAL §§ 20.01(1)(A), 20.02(a), 22.01(a)(1), (b)(2)(A)(i) (West Supp. 2024), § 22.07(a)(2), (c)(1) (West 2019), §§ 38.04(a), 42.062(a) (West 2016).

The trial court held a hearing on the motion to revoke on May 11, 2023. At the outset of the hearing, the State informed the trial court that it was abandoning the first allegation concerning the claim that Appellant evaded arrest or detention. Appellant pleaded "not true" to the remaining four allegations.

The State called Stephanie Gomez to testify about her relationship with Appellant and the events that took place on November 15, 2022. Gomez testified that she and Appellant were in a dating relationship for nine years and had three children together. Gomez ended the relationship in April 2022 after Appellant hit her multiple times with a closed fist and attempted to choke her. Gomez testified that Appellant had a pending assault charge against him as a result of the April 2022 incident.

After the April 2022 incident, Gomez started a new dating relationship and began living at a different address with her boyfriend. On November 15, 2022,

Gomez allowed Appellant to spend the night at her home because he had recently been released from jail and his family would not let him stay at their house. Three of Gomez's children were at the home. Gomez's boyfriend was working out of town and was not aware that Appellant was in the home.

Gomez slept in the children's bedroom because she did not "trust" Appellant. Appellant was "supposed to sleep on the couch" but "ended up going into the [children's] bedroom" and woke Gomez up. Gomez went into the living room with Appellant and had sex with him. Gomez then went back into the children's room. Appellant came into the room "trying to have more," and Gomez told Appellant that she did not want to. Gomez left the children's bedroom and went into her bedroom. Appellant followed, and Gomez told him to get out of her bedroom. Appellant refused to leave and started "getting angry." Appellant threw Gomez's dresser onto the floor.

Gomez testified that she went to the corner of her bed "because that's [her] thing. [She] always [has] to hide in the corner with him." Appellant was "slamming his hand on the bed" and screaming at Gomez to "stop cheating on him." Gomez said that Appellant was "screaming and screaming and that he's going to kill [her] and he's going to ruin everything, that he hates [her], and that he wants [her] dead." Gomez testified that she felt like Appellant would "follow through" with his threat to kill her and that she felt threatened by him. Gomez testified that she could not leave the room because Appellant was "right there at the edge of the bed."

Gomez told Appellant that she would call the police if he did not stop, but he continued "screaming and screaming and going on and on." Gomez said that she called 9-1-1 and that Appellant was still screaming as she was telling the dispatcher what was happening. Gomez testified that it seemed like Appellant did not believe she was on the phone with 9-1-1 at first and that he started apologizing once she put

4

the dispatcher on speakerphone. Gomez continued telling Appellant to get out of her bedroom, but he was "still not listening."

Gomez tried to leave the apartment while she was on the phone with 9-1-1, but Appellant "grabbed" her, turned her around, and tried to take the phone from her hand. Gomez testified that Appellant squeezed her hand when he tried to take the phone from her, causing her pain, and that Appellant was aware she was on the phone with 9-1-1 when he did so. Gomez started screaming and Appellant let go, allowing Gomez to run outside.

Two police officers arrived soon after Gomez ran outside. After speaking to both Appellant and Gomez, the officers arrested Appellant for "terroristic threat, assault family violence, [and] interfering with a phone call." Gomez testified that this was one of many times that Appellant assaulted her while he was on community supervision.

Appellant testified in his defense. Appellant said that his relationship with Gomez had its "[u]ps and downs, just like a normal marriage." Appellant testified that he and Gomez began arguing in 2021 because Gomez started working and "seeing other people." Appellant said that he was upset because "dangerous" people who "were on drugs" and "dealing drugs" began coming to their house "with guns and all kinds of stuff." Appellant testified that he never physically attacked Gomez while they were arguing and that he never assaulted Gomez during their relationship.

Appellant testified that Gomez asked him to come over on November 15, 2022, because she was "getting rid" of her boyfriend after "he had stuff thrown all over the apartment where he was being abusive." Gomez's boyfriend "started friction" that evening because he had called Gomez and had shown up at the home, even though he was supposed to be at work. Appellant and Gomez argued in her bedroom that night, but it was "[n]onviolent." Appellant testified that he never prevented Gomez from leaving the bedroom and that, while he asked Gomez to hang

up the phone when she called 9-1-1, he never put his hands on her to prevent her from making the call.

Appellant confirmed on cross-examination that one of the violations in the State's second motion to revoke was based on assaulting Gomez in April 2022, but testified that "that one was dismissed" and that he did not plead true to the allegation. When asked if he recognized his signature on waiver and stipulation forms confirming that he was pleading true to the State's motion to revoke, Appellant said, "I recognize my signature, but that kind of looks off."

After brief closing arguments from both parties, the trial court addressed Appellant and said the following:

> I fear, sir, that your children have seen the violence and the abuse in your family, because if they have, you have created children that will probably be abusers. They will probably commit violence. And that's what all the studies show. And as a Judge and as a lawyer, that's what I've seen over my whole life since I was a young guy.
>
> And so what you've done is much more serious than just doing it to the person that loves you and has children with you. It's doing it to the children, because the pattern that you set because they will -- they will have a hard time breaking from your mold. And that's sad. And I hope you're sad about that.
>
> I want you to know that I use a term that's very harsh, and that's called a family terrorist. Terrorism is when you cause fear. We hear about terrorism about buildings falling and about bombs on television and things like that. And that terrorism is simply actions that cause fear in people. And what you did caused fear in your loved one and fear in your -- the mother of your children. And that won't go unpunished in this court.
>
> . . . .
>
> The Court finds that you violated the terms and conditions of your probation as set forth in the documents. The Court revokes your probation because of that violation, and it's based on a preponderance

6

of the evidence, which means it's more likely that it occurred than it didn't occur. That's the standard. It's the lowest standard. It's easily met in this particular case.

The trial court revoked Appellant's community supervision and sentenced him to confinement for a term of five years in the Institutional Division of the Texas Department of Criminal Justice on both counts. The trial court's judgments of conviction also ordered Appellant to pay the remaining balance of the $1,000 fine previously assessed. The trial court reiterated that Appellant's sentence was based on his original plea bargain for community supervision, the "credible evidence" presented, and the trial court's finding that Appellant "violated the terms and conditions of probation as set forth in allegations 2, 3, 4, and 5." Appellant did not request on the record that the trial court enter written findings of fact and conclusions of law in support of his decision to revoke Appellant's community supervision, and the clerk's record does not contain a written request that the trial court do so.

Appellant subsequently filed a motion for new trial, asserting that the "verdict in this cause are [sic] contrary to the law and the evidence." Appellant also filed a motion titled "Request for Findings of Fact and Conclusions of Law," which asked the trial court to "make findings of fact and conclusions of *law regarding the following motion filed by defendant: Motion for new trial*" (emphasis added). The trial court granted Appellant's request for findings of fact and conclusions of law regarding Appellant's motion for new trial but denied the motion for new trial. The clerk's record does not contain findings of fact and conclusions of law regarding Appellant's motion for new trial, despite the trial court's order granting the motion.

*Analysis*

In his first issue, Appellant contends that the trial court abused its discretion and denied him his due process rights when it revoked his community supervision.[1] Due process in the revocation context requires a hearing, written notice of the claimed violations, disclosure of the evidence against the defendant, an opportunity to be heard and to present witnesses and documentary evidence, a neutral hearing body, and "a written statement by the fact finder as to the evidence relied on and the reasons for revoking probation." *Ex parte Carmona*, 185 S.W.3d 492, 495 (Tex. Crim. App. 2006) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973)).

When the trial court revokes a defendant's community supervision, due process requires specific written findings of fact if a defendant requests findings of fact be made. *See Whisenant v. State*, 557 S.W.2d 102, 105 (Tex. Crim. App. 1977). However, the trial court is not required to issue separate findings if the judgment or revocation order discloses the grounds for revocation found by the court. *Smith v. State*, 587 S.W.3d 413, 421–22 (Tex. App.—San Antonio 2019, no pet.); *see also Ford v. State*, 488 S.W.2d 793, 795 (Tex. Crim. App. 1972); *Reasor v. State*, 281 S.W.3d 129, 136 (Tex. App.—San Antonio 2008, pet. ref'd) (holding that the trial court orally specifying which allegations it found to be true and a written judgment reflecting that the trial court found certain alleged violations "as set out in the State's motion to revoke" to be true complied with due process); *Joseph v. State*, 3 S.W.3d 627, 640 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding that handwritten notations on the trial court's order revoking community supervision, "[w]hile

---

[1]Ordinarily, we would address an issue challenging the sufficiency of the evidence first. But because Appellant's evidentiary challenge in his second issue is based, in part, on his assertion that he "has never been told what violations of [his] probation were found to be true by the Trial Court," we will initially address his first issue.

perhaps not a model example of findings of fact," adequately communicated the grounds on which it found the appellant violated his community supervision).

Appellant asserts that the trial court did not articulate which allegations it found to be true and "ignored" his request for findings of fact and conclusions of law, thereby leaving Appellant "to guess at what evidence the Trial Court based the grounds for revocation on" and preventing him from "effectively prosecut[ing] an appeal." The State asserts that "Appellant cannot now complain about the trial court's failure to make detailed findings as to the revocation evidence because he did not request findings."

The only request for findings of fact and conclusions of law found in the record is Appellant's request for findings of fact and conclusions of law regarding his motion for new trial. Appellant asserts that, "[e]ven if one argues that the Findings of Fact filed is limited to the issue of the Motion for New Trial, the motion was summarily denied without explanation, despite the Court's contrary order granting the request for findings of fact." But Appellant is not asserting that the trial court abused its discretion in overruling his motion for new trial. Rather, Appellant is asserting that the trial court violated his due process rights and prevented him from adequately pursuing an appeal because it failed to enter findings of fact and conclusions of law showing the grounds for the trial court's revocation of his probation. Appellant does not expound upon the effects, if any, the trial court's failure to enter findings of fact regarding the denial of his motion for new trial would have on his due process rights. Regardless, even if Appellant *had* requested that the trial court enter findings of fact and conclusions of law showing the grounds for the trial court's revocation of his probation, Appellant's due process rights were not violated.

Appellant's assertion that the trial court never articulated the grounds upon which it revoked his probation is incorrect. The facts in *Reasor* are similar to the

facts currently before us. *See Reasor*, 281 S.W.3d at 136. Here, the trial court orally found that Appellant violated the terms and conditions of his community supervision "as set forth in the documents." The trial court also explained to Appellant at the hearing that his sentence was based on the "credible evidence" presented by the State at the hearing and the trial court's finding that Appellant "violated the terms and conditions of probation as set forth in allegations 2, 3, 4, and 5." The trial court's written judgments state that the trial court's findings are: "True to all allegations with the State abandoning Allegation One." The judgments also state that "the Court is of the opinion and finds by a preponderance of the evidence that the defendant violated the terms and conditions of community supervision while they were in full force and effect as set out in the document attached hereto." A copy of the State's allegations in its motion to revoke is attached to each judgment. Accordingly, Appellant was provided adequate notice of the grounds underlying the trial court's revocation, and his ability to prosecute an appeal was not diminished by the absence of further findings. *Id*; *see Smith*, 587 S.W.3d at 421–22.

Appellant also notes that the clerk's record contains a waiver and stipulation form signed by the trial court stating that Appellant was pleading true to the State's motion to revoke and that he intended to judicially confess his guilt. Appellant asserts that the trial court's signature on a document "contrary to the balance of the record" makes "a finding of fact on the record [] vital to the Appellant receiving due process." Notably, the form is only signed by the trial court—the signature lines for Appellant, his attorney, and the State's attorney are all left blank.

While we agree with Appellant's assertion that the trial court's signature on the waiver and stipulation form is contrary to the balance of the record, the record contains ample evidence indicating that the trial court was not under the mistaken impression that Appellant was pleading true to the allegations in the State's motion to revoke. The combination of (1) the absence of any additional required signatures

on the waiver and stipulations form, (2) Appellant pleading "not true" to each of the State's allegations at the hearing on his motion to revoke, and (3) the judgments revoking Appellant's community supervision reflecting that Appellant pleaded "not true" to the State's allegations all point to the trial court's signature on the form being a clerical error.

Further, as we previously discussed, the trial court found on the record that Appellant violated his probation as alleged in the State's motion to revoke, with the exception of the allegation abandoned by the State. Further, the judgments included the trial court's written findings that Appellant violated the terms and conditions of his community supervision as alleged in the State's motion to revoke. These matters clearly show that the trial court found each of the alleged violations in the State's motion to revoke to be true by a preponderance of the evidence. Therefore, we do not believe that the trial court's likely accidental signature on a waiver and stipulations form confuses the record to the point where Appellant is unable to effectively appeal the revocation of his community supervision.

The record of the hearing on the State's motion to revoke and the trial court's written judgments reflect that the trial court found Allegation Nos. 2, 3, 4, and 5 to be true as alleged in the State's motion to revoke. Accordingly, the trial court did not violate Appellant's due process rights when it failed to enter written findings of fact and conclusions of law regarding its decision to revoke Appellant's community supervision. We overrule Appellant's first issue.

In his second issue, Appellant asserts that the trial court abused its discretion in revoking his probation because the evidence presented at the hearing was "both legally and factually insufficient to establish which, if any, violation"[2] was proven true by a preponderance of the evidence. We will construe Appellant's assertion as

_____

[2]Appellant reasserts that he "has never been told what violations of [his] probation were found to be true by the Trial Court."

11

a claim that the State failed to prove Allegation Nos. 2, 3, 4, and 5 in its motion to revoke by a preponderance of the evidence.

Given the unique nature of a revocation hearing and the trial court's broad discretion in the proceedings, general standards for reviewing the sufficiency of the evidence do not apply. *See Hacker v. State*, 389 S.W.3d 860, 864–65 (Tex. Crim. App. 2013); *Miles v. State*, 343 S.W.3d 908, 912–13 (Tex. App.—Fort Worth 2011, no pet.). Instead, we review a trial court's decision to revoke community supervision under an abuse of discretion standard. *Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006); *Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984). The State must prove a violation of the terms and conditions of community supervision by a preponderance of the evidence, and proof of any one of the alleged violations is sufficient to uphold the trial court's decision to revoke. *Garcia v. State*, 387 S.W.3d 20, 26 (Tex. Crim. App. 2012) ("proof of a single violation will support revocation"); *Cardona*, 665 S.W.2d at 493 (burden of proof is by a preponderance of the evidence); *Moore v. State*, 605 S.W.2d 924, 926 (Tex. Crim. App. [Panel. Op.] 1980); *Jones v. State*, 472 S.W.3d 322, 324 (Tex. App.—Eastland 2015, pet. ref'd).

The trial court abuses its discretion by revoking community supervision if the State failed to meet its burden of proof. *Cardona*, 665 S.W.2d at 493–94; *Scamardo v. State*, 517 S.W.2d 293, 298 (Tex. Crim. App. 1974). "[A]n order revoking probation must be supported by a preponderance of the evidence; in other words, that greater weight of the credible evidence which would create a reasonable belief that the defendant has violated a condition of his probation." *Scamardo*, 517 S.W.2d at 298. The trial court is the sole trier of the facts, the credibility of the witnesses, and the weight given to their testimony. *Naquin v. State*, 607 S.W.2d 583, 586 (Tex. Crim. App. [Panel Op.] 1980). An appellate court must view the evidence presented at a revocation hearing in the light most favorable to the trial

court's ruling. *Garrett v. State*, 619 S.W.2d 172, 174 (Tex. Crim. App. [Panel Op.] 1981).

Gomez and Appellant were the only witnesses to testify at the revocation hearing. Gomez's testimony supported each of the State's allegations. While Appellant's testimony contradicted Gomez's testimony, it was solely within the trial court's authority to determine the credibility of Gomez and Appellant and to decide what weight to give their testimony.

Allegation No. 2 stated that Appellant intentionally and knowingly by force, intimidation, or deception, restrained Gomez without her consent by "cornering her and physically blocking her from moving and exiting the bedroom." Gomez testified that Appellant was in her bedroom despite her repeatedly telling him to get out. Gomez said that she moved to the corner of her bed after Appellant threw her dresser onto the floor. Gomez said that she had to be "smart" about trying to leave her bedroom because Appellant was "right there in [her] way, so [she] didn't try to [exit the room]." Accordingly, there was sufficient evidence to support that Appellant restrained Gomez without her consent by cornering her and physically blocking her from being able to move off of the bed or exit the bedroom. *See* PENAL §§ 20.01(1)(A), 20.02(a).

Allegation No. 3 stated that Appellant intentionally and knowingly prevented and interfered with Gomez's ability to place a 9-1-1 call and to request emergency assistance. Gomez testified that Appellant tried to take the phone from her hand by squeezing her hand and causing her pain while she was on the phone with a 9-1-1 dispatcher and after she put the call on speakerphone; he only let go when she "started screaming." Accordingly, there was sufficient evidence to find that Appellant intentionally or knowingly interfered with Gomez's ability to request emergency assistance. *See* PENAL § 42.062(a).

Allegation No. 4 stated that Appellant threatened to murder Gomez with the intent to place Gomez in fear of imminent serious bodily injury and that Gomez was a member of Appellant's family and/or household. Gomez testified that Appellant told her he was going to "kill" her and that she felt like Appellant was going to "follow through" with his threat. Gomez also testified that she and Appellant were in a dating relationship for nine years, that they lived together during their relationship, and that she and Appellant had three children together. Appellant testified that he and Gomez were "common law married" and were "coparenting" their children. Accordingly, there was sufficient evidence to find that (1) Appellant threatened to murder Gomez with the intent to place her in fear of imminent serious bodily injury, and (2) that Gomez was a member of Appellant's family. *See* PENAL § 22.07(a)(2), (c)(1), (f)(1); TEX. FAM. CODE ANN. § 71.003 (West 2019).

Allegation No. 5 stated that Appellant intentionally and knowingly caused bodily injury to Gomez, a member of his family and/or household and with whom he has had a dating relationship, by "grabbing [her] from behind and forcefully turning her body and limbs" and that he had previously been convicted of an offense against a member of his family or household or with whom he had had a dating relationship. We have already determined that there was sufficient evidence that Appellant and Gomez were family, and both Gomez and Appellant testified that they had some form of a dating relationship. Further, Gomez testified that Appellant "grabbed me like this" and tried to take her phone from her hand, causing her pain. While we are unable to determine from the record what Gomez specifically meant when she said Appellant grabbed her "like this," Gomez later said that, "when I turned, that's when he pulled me." The State offered, and the trial court admitted, the previous judgments modifying Appellant's community supervision, wherein Appellant pleaded "true" to the allegation that he had committed an assault against Gomez and had previously been convicted of assault family violence in trial court

14

cause number 120336 on or about May 21, 2008 in Midland County, Texas. Accordingly, there was sufficient evidence to find that Appellant intentionally and knowingly caused Gomez, a member of his family and a person with whom he had a dating relationship, by grabbing her from behind and forcefully turning her body and limbs, and that Appellant had been previously convicted of assault family violence as alleged in the State's motion to revoke. *See* PENAL § 22.01(a)(1), (b)(2)(A)(i).

There was sufficient evidence to support the trial court's finding that the State proved Allegation Nos. 2, 3, 4, and 5 by a preponderance of the evidence. *See Rickels*, 202 S.W.3d at 764. Therefore, the trial court did not abuse its discretion in revoking Appellant's community supervision. *See id*. We overrule Appellant's second issue.

*This Court's Ruling*

We affirm the judgments of the trial court.


JOHN M. BAILEY
CHIEF JUSTICE


June 26, 2025

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.