

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-25-00133-CR

———————————————————

CHRISTOPHER BLEVINS, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from County Criminal Court No. 2
Denton County, Texas
Trial Court No. CR-2022-03656-B

---

Before Bassel, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

Appellant Christopher Blevins pleaded nolo contendere to Class A misdemeanor assault in exchange for twelve months' deferred-adjudication community supervision, a $200 fine, and the State's abandoning his indictment's family-violence allegation. *See* Tex. Penal Code Ann. § 22.01(a), (b); *see also id.* § 12.21 (stating Class A misdemeanor punishment of confinement for up to a year and up to a $4,000 fine). Less than a year later, the trial court adjudicated his guilt and sentenced him to 250 days' confinement in county jail. In a single point, Blevins complains that he received ineffective assistance of counsel during the adjudication proceedings. Because the record is insufficient to support this claim, we affirm the trial court's judgment.

## II. Background

In April 2023, when Blevins accepted the plea bargain, he agreed to community-supervision conditions that—among other things—required him to report monthly in person to the Community Supervision and Corrections Department (CSCD) (condition C); complete 80 hours of community-service restitution and provide his CSCD officer with verification of hours worked monthly (condition I); complete a drug/alcohol

2

evaluation (condition 8); and participate in an anger-management program (condition 13).[1]

Less than a year later, in March 2024, the State moved to proceed to adjudication, alleging that Blevins had violated, among others, the above conditions by failing to report to his CSCD officer in August, September, October, November, and December 2023, and January, February, and March 2024; failing to complete 80 hours of community service; failing to complete the drug/alcohol evaluation; and failing to participate in an anger-management program. At the hearing on the State's motion, Blevins pleaded "true" to allegations (I), (8), and (13), and "not true" to allegation (C)—the failure-to-report allegation—and the remaining allegations.[2]

## A. The court's file

Before testimony began, the trial court took judicial notice of its file's contents. The file included the August 17, 2022 "Affidavit of Surety to Surrender Principal," in which Blevins's bond agent asked to surrender him because he had failed to check in since January 1, 2022, despite his frequent promises to do so, and recounting that Blevins's co-signer had advised that Blevins had changed his address. The file contains

---

[1]The community-supervision order contained two sets of conditions: conditions (A)–(M) were standard conditions, while conditions (1)–(25) were additional conditions that applied only if the trial court placed a checkmark next to them.

[2]The other conditions, and the allegations pertaining thereto, involved Blevins's failing to make payments. Because the trial court did not find "true" the allegations pertaining to these conditions, we need not recount them. *See* Tex. R. App. P. 47.1.

the order granting the request and directing the clerk to issue a capias for Blevins's arrest, and documents showing that a few days later, Blevins signed additional conditions of bond and was released on a higher bond with a different company.

After the State filed its motion to proceed to adjudication, Blevins arranged with another company for bond pending the hearing, and the trial court appointed counsel for him based on indigence. Four months later, however, Blevins moved to substitute retained counsel, who represented him at the revocation hearing and whose performance has been alleged deficient in this appeal.

## B. The State's case

Pollie Upton, a Denton County CSCD officer, testified as the business-records custodian of Blevins's file. She listed his community-supervision conditions and stated that he had been required to sign off on them. Upton testified that Blevins had failed to report as charged in allegation (C), stating, "I think they saw him only three times."[3] Before the State's motion was filed, Blevins transferred his community supervision to Van Zandt County.

---

[3]The court's file contains documents showing that Blevins accepted the plea bargain for deferred-adjudication community supervision in April 2023, and in its motion to proceed to adjudication, the State alleged that he had failed to report monthly for eight months, from August 2023 to March 2024, which matches Upton's testimony that he had reported in person three times, which would have been May, June, and July 2023.

Upton had no record that Blevins had completed any of his community-service hours in condition (I), that he had completed his drug/alcohol evaluation in condition (8), or that he had participated in an anger-management program in condition (13). Upton stated that it had been Blevins's responsibility to turn in records or certificates if he completed anything and that all his community-supervision conditions continued to apply when he transferred to a new county. She recommended revocation "unless there's proof that he was incapacitated and couldn't report," because "reporting is one of the easiest things that somebody can do. It's free to report, and it's only once a month."[4]

During cross-examination, Upton admitted that she had never spoken with Blevins in person and that her file stated that Robert Landrum had been his Van Zandt CSCD officer. She did not have Landrum's records, stating, "All I know is that he's telling us that [Blevins] did not report. I don't have his phone call records." She had no information from Landrum about why Blevins did not report or about any circumstances that might have prevented him from reporting. The only item in her file from Landrum was "a closure-of-interest letter because of [Blevins's] absconding," by which she meant Blevins's failure to report, and Landrum's report to Denton CSCD in November 2023 that the first time Blevins had failed to report was in August 2023.

---

[4]Regarding some of the failure-to-pay revocation allegations, Upton testified that Blevins could have set up a payment plan but that CSCD "couldn't find him" to set up such a plan because he had been failing to report.

Upton did not know how many times Veronica Soto, Blevins's Denton County CSCD officer, had spoken with Blevins because "[h]e got probation in April and soon thereafter was MIA" from both counties based on his lack of communication. Upton stated, "We started getting word from the other county that he was not reporting in November, and that's the day that Soto started calling him." Upton stated that Soto had tried to contact Blevins several times "after he . . . disappeared, for lack of a better word" and that Soto had verified Blevins's phone number and had spoken with his mother.

## C. The Defense case

Blevins's counsel called him as the sole defense witness.[5] Blevins testified that he lived with his mother, that he had lived with her at that address for over twelve years—contrary to the surety affidavit's representation that he had changed addresses in 2022—and that he had spent ten years employed in the same job when he began his community supervision. Blevins said that after his stepfather died and his brother went to prison, he quit his job to become his mother's full-time caregiver. They lived on her disability income and his intermittently working "here-and-there side jobs, handyman stuff."[6]

---

[5]Before Blevins testified, he consulted with his counsel.

[6]Blevins testified that his mother's monthly disability income was around $1,100, half of which went to rent; the rest went to their electricity bill and other living expenses. He acknowledged that he had been ordered to attend drug/alcohol and anger-

6

Blevins testified that his mother was competent but had falling spells and that her health had been declining. She could be without supervision for only "[t]hirty minutes max," and he was the only person available to supervise her care besides hospice's three-day-a-week visits. On Tuesdays and Fridays, she would be alone if he were not there. When his counsel asked, "If the Court were to revoke you and place you in prison, who would take care of your mother?" Blevins replied, "She would pass away."

Blevins stated that he spoke with someone from Denton County CSCD once—the day he was placed on community supervision—and then he transferred to Van Zandt County and started reporting there. He had reported in person at first, but the CSCD office was fifteen miles from his home, and he and his mother had no vehicle, so he had no way to get there unless someone else drove him. He relied on others' generosity for transportation. Blevins claimed that when he told Landrum this, Landrum told him, "Just do your best."

Blevins also testified that he had called Landrum several times about why he could not report in person, including each reporting date, and left messages but never received a call back. He never called Denton County CSCD because he had been "told

---

management programs but stated that he had no income with which to enroll in them because he had no job. He had not asked about any free programs.

that once [he] was transferred, Van Zandt County had . . . the supervision of [him]" and that he did not have to report or talk to Denton County CSCD.

When asked about Upton's testimony about the Denton County CSCD's call his mother had answered, Blevins stated, "She may have answered it, but that's not my phone number. And they have my phone number." He opined that they must have called his mother's cell phone, and he stated that he had never been told about the call. He also stated that his phone number had been the same for more than five years but that no one from CSCD had ever called him.

During cross-examination, Blevins agreed that on his first meeting with Denton County CSCD, his community-supervision conditions were explained to him. He had relayed his financial-situation information to Landrum but not to Denton County CSCD because he "was told [he] didn't have to talk to Denton County since [he] was being transferred." He stated that he felt like he had tried to stay in compliance with his community-supervision conditions by calling in for reporting even though he knew that his reporting was supposed to be in person. A friend had driven him to the revocation hearing.

During his redirect examination, Blevins claimed that he had not deliberately avoided reporting and cited the fact that he had previously been on child-support community supervision and had reported monthly until he completed it to support his argument that but for his lack of transportation and funds, he could have met his

community-supervision reporting requirements. He also stated that he believed that he had done the right thing by quitting his job to take care of his mother.

## D. Closing arguments, adjudication, and sentencing

During closing arguments, Blevins's counsel argued that Blevins had been placed in a "Hobson's choice"[7] between his legal obligations to the State and his moral obligation to take care of his mother, and he emphasized Blevins's having to choose between his steady job of ten years and "the potential for [his mother's] death being on his conscience for the rest of his life" if he left her alone in a poor medical condition. Blevins's counsel also attacked the State's case, stating that the testimony presented by the State was "spotty" and asserting that Blevins had never contacted Denton County CSCD after he received the transfer paperwork "because he was contacted by Van Zandt County and made the assumption that they were the people who would supervise his obligations to the Court."

The prosecutor responded that Blevins was a poor community-supervision candidate based on his failures to comply with several conditions despite having been "given ample opportunities to seek out how to get help, namely by receiving probation in the first place." The prosecutor argued that Blevins had understood the conditions and had taken accountability for what he was signing up for, so it was "his responsibility

---

[7]A Hobson's Choice is "a choice with the appearance of several options, but really only one option." *Hance v. State*, 714 S.W.3d 775, 844 n.45 (Tex. App.—Fort Worth 2025, no pet.) (op. on reh'g).

to make sure that he [was] in compliance with the terms of the probation that he set forth and agreed to."

After confirming that Blevins's mother was at home alone, the trial court found "true" allegations (C), (I), (8), and (13); adjudicated Blevins's guilt; and sentenced him to 250 days' confinement. The trial court then asked Upton to make a referral to Adult Protective Services for Blevins's mother, stating that, based on Blevins's testimony, "we've been notified that someone is in grave danger if she's been left alone, and she's been left alone."

## III. Discussion

In a single point, Blevins complains that his counsel was ineffective both through deficient advice, which caused his three "true" pleas to be involuntary, and through his failure to procure and admit medical evidence to corroborate his testimony about his mother's health.

The State responds that the record is insufficient to show ineffective assistance and to rebut the presumption that counsel's actions were the result of a strategic or reasonable decision and points out that Blevins pleaded "not true" to allegation (C), which the trial court found "true," so his community supervision would have been revoked even without his "true" pleas.

### A. Standard of review

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. *Ex parte Scott*, 541 S.W.3d 104, 114 (Tex. Crim. App. 2017); *see* U.S. Const.

10

amend. VI. To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). The record must affirmatively demonstrate that the claim has merit. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307; *Thompson*, 9 S.W.3d at 813–14. Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

An appellate court may not infer ineffective assistance simply from an unclear record or a record that does not show why counsel failed to do something. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. If trial counsel did not have that opportunity, we should not conclude that counsel performed deficiently unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308. Direct appeal

11

is usually inadequate for raising an ineffective-assistance-of-counsel claim because the record generally does not show counsel's reasons for any alleged deficient performance. *See Menefield*, 363 S.W.3d at 592–93; *Thompson*, 9 S.W.3d at 813–14.

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. We must ultimately focus on examining the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069.

## B. Analysis

We agree with the State that Blevins cannot show on this record that there was a reasonable probability that the proceeding would have turned out differently without counsel's alleged deficient performance.[8]

In a revocation proceeding, the State must prove by a preponderance of the evidence that the defendant violated at least one community-supervision condition.

---

[8]We need not address both parts of the *Strickland* test if the appellant makes an insufficient showing on one component, nor do we need to address them in any particular order. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

12

*Lawrence v. State*, 420 S.W.3d 329, 331 (Tex. App.—Fort Worth 2014, pet. ref'd). A preponderance of the evidence is met if the greater weight of the credible evidence creates a reasonable belief that the defendant has violated the community-supervision condition. *See Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013). The trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony, and we review the evidence in the light most favorable to the trial court's ruling. *Lawrence*, 420 S.W.3d at 331.

Here, Blevins pleaded "not true" to the State's allegation that he failed to report to his CSCD officer in August, September, October, November, and December 2023, and January, February, and March 2024, but he admitted to not having reported in person starting in August 2023. He also admitted that he had not tried to explain his lack-of-transportation or financial situation to Denton County CSCD before the revocation hearing. Upton's testimony was that he had reported a total of three times, which matched Blevins's admission, and—according to Upton—she had nothing from Landrum and nothing in Denton County's CSCD file to support any reason for Blevins's failure to report or any circumstances that might have prevented him from reporting. Instead, despite Denton County CSCD's attempts to contact Blevins, which began in November 2023 upon learning about his failure to report, he had "disappeared."

Although Blevins argues that failing to report was against his will when he had no transportation, citing us to and attempting to distinguish his case from *Valdez v.*

13

*State*, 508 S.W.2d 842 (Tex. Crim. App. 1973);[9] *Hurd v. State*, 483 S.W.2d 824 (Tex. Crim. App. 1972);[10] and *Waggoner v. State*, No. 11-07-00335-CR, 2009 WL 1800617 (Tex. App.—Eastland June 25, 2009, pet. ref'd) (mem. op., not designated for publication),[11] he ignores that the trial court could have found some portions of his testimony not credible. Specifically, the trial court was entitled to disbelieve his testimony that

- Denton County CSCD never tried to contact him, contrary to Upton's testimony;

- Landrum told him, "Just do your best," when he had explained to the Van Zandt CSCD officer his lack of transportation;

- he had not been deliberately avoiding his in-person reporting requirement; and

- that he had insufficient funds and friends to have himself transported to the CSCD office once a month.

---

[9]In *Valdez*, the court held the failure-to-report allegation was sufficiently supported when, although the appellant testified that car failure kept him from reporting, he had also testified that he did not think of catching the city bus or taking a taxi, that his brother drove him to work, and that a friend could have taken him to report. 508 S.W.2d at 843–44.

[10]In *Hurd*, the court held that the record showed that the appellant had failed, without valid explanation, to report as directed when he admitted that he did not report while in the hospital for three months and then after he was released from the hospital, he made no effort to contact his probation officer despite knowing that he was supposed to report monthly. 483 S.W.2d at 824–25.

[11]In *Waggoner*, the court noted that failing to report as ordered "is not excused merely by an inability to travel" and held that the appellant's transportation troubles did not excuse his failure to report "absent evidence that he could not find alternative transportation." 2009 WL 1800617, at *2.

14

Blevins testified that he had relied on others' generosity for transportation but did not explain why that generosity had failed him when it came to reporting in person once a month for eight months when he was able to attend the revocation hearing because a friend drove him.[12]

Because the evidence to support condition (C), to which Blevins pleaded "not true," is sufficient to support the trial court's "true" finding—and a "true" finding on only one condition is required, *see Lawrence*, 420 S.W.3d at 331—Blevins cannot show that there was a reasonable probability that the proceeding would have turned out differently without counsel's allegedly deficient performance leading to his "true" pleas on other conditions. *See Smith v. State*, 286 S.W.3d 333, 345 (Tex. Crim. App. 2009) ("[B]y failing to explain how counsel's allegedly unprofessional errors would have changed the trial court's finding of true on all three violations in the State's motion to adjudicate, the appellant failed to show that but for counsel's deficiency the result of

---

[12]Blevins also ignores that the trial court took judicial notice of the case's file, which included the August 2022 surety's affidavit seeking to surrender him because of his alleged failure to check in since January 2022, indicating that even before being placed on community supervision in April 2023, Blevins's failure to report to his bondsman was an issue, which could have undermined his credibility. *But see Wright v. State*, No. 05-22-00429-CR, 2024 WL 1154152, at *5 (Tex. App.—Dallas Mar. 18, 2024, no pet.) (mem. op., not designated for publication) ("[W]hile a court may take judicial notice *that* a document has been filed, the trial court may not take judicial notice of the truth of factual statements and allegations contained in the pleadings, affidavits, or other documents in the file."). He also ignores that the file shows that he had been able to find funds to retain counsel to represent him at the hearing.

the hearing to adjudicate guilt would have been different."). We overrule this portion of his sole point.

Further, although Blevins questions his counsel's effectiveness for failing to procure and admit medical evidence to corroborate his testimony about his mother, the record reflects that his counsel put into evidence through Blevins's testimony sufficient information about her poor health condition—which had put her on disability and hospice care three times a week—to argue that Blevins had been forced to choose between following his community-supervision conditions or caring for his mother as an excuse for his failure to comply with those conditions. Even without any other medical evidence, what counsel put forth was sufficient for the trial court to request a referral to Adult Protective Services out of concern for Blevins's mother at the hearing's conclusion.

Furthermore, because Blevins did not file a motion for new trial to introduce into the record any additional medical evidence and to question counsel about his strategy, on this record, Blevins cannot show that there was a reasonable probability that the proceeding would have turned out differently if counsel had obtained and offered any additional medical evidence. *See Menefield*, 363 S.W.3d at 592 (stating that for an ineffective-assistance claim to succeed, the record must demonstrate both deficient performance by counsel and prejudice suffered by the defendant and that the record must affirmatively demonstrate the claim's meritorious nature); *see also Johnson v. State*, 624 S.W.3d 579, 586 (Tex. Crim. App. 2021) ("Counsel gets the benefit of the

doubt from a silent record, and courts must assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined."); *Coon v. State*, No. 02-24-00252-CR, 2025 WL 1141884, at *3 (Tex. App.—Fort Worth Apr. 17, 2025, no pet.) (mem. op., not designated for publication) (referencing the inadequacies inherent in evaluating direct-appeal ineffective-assistance claims when an appellant does not file a new-trial motion or otherwise try to make a record giving his trial counsel an opportunity to show whether his challenged actions were grounded in sound trial strategy).[13] We overrule the remainder of Blevins's sole point.

## IV. Conclusion

Having overruled Blevins's sole point, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: October 23, 2025

---

[13]The State points out that the medical records "could have contained information damaging to Blevins's arguments or inconsistent with his testimony," as could have testimony from other potential witnesses, and that the record is silent as to why the records were not procured or other witnesses not called because counsel was not given the opportunity to explain his trial strategy.